IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT


SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.


| | |
|---|---|
| BILLIE WASHINGTON, TINA SMITH, OPAL GIBSON, PENNSYLVANIA MENTAL HEALTH CONSUMERS' ASSOCIATION, MENTAL HEALTH ASSOCIATION IN PENNSYLVANIA, MENTAL HEALTH ASSOCIATION OF SOUTHEASTERN PENNSYLVANIA, THE PHILADELPHIA ALLIANCE, DRUG AND ALCOHOL SERVICE PROVIDERS ORGANIZATION OF PENNSYLVANIA, PENNSYLVANIA COMMUNITY PROVIDERS ASSOCIATION, SUCCESS AGAINST ALL ODDS | No. 50 MAP 2016<br><br>Appeal from the Order of the Commonwealth Court at No. 602 MD 2012 dated March 28, 2016 and exited March 29, 2016.<br><br>ARGUED: September 13, 2017 |
| v. | |
| THE DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA | |
| APPEAL OF: BILLIE WASHINGTON, TINA SMITH, OPAL GIBSON, PENNSYLVANIA MENTAL HEALTH CONSUMERS' ASSOCIATION, MENTAL HEALTH ASSOCIATION IN PENNSYLVANIA, MENTAL HEALTH ASSOCIATION OF SOUTHEASTERN PENNSYLVANIA, THE PHILADELPHIA ALLIANCE, DRUG AND ALCOHOL SERVICE PROVIDERS ORGANIZATION OF PENNSYLVANIA, SUCCESS AGAINST ALL ODDS | |


## OPINION

JUSTICE TODD                                          DECIDED: July 18, 2018

This is a direct appeal from an order of the Commonwealth Court sustaining the demurrer of the Department of Public Welfare ("DPW") to a complaint filed by three disabled individuals who formerly received cash general assistance benefits from DPW, and seven organizations involved in the provision of a variety of human services to poor and disabled individuals in Pennsylvania (collectively "Appellants"). Appellants alleged in their complaint that the manner in which the Pennsylvania General Assembly enacted Act 80 of 2012[1] ("Act 80") — a piece of legislation which, *inter alia*, made sweeping changes to the administration the state's human services programs, and reauthorized a levy on nursing homes imposed to obtain federal matching funds for the care of elderly nursing home patients — violated Article III, Sections 1,[2] 3,[3] and 4[4] of the Pennsylvania Constitution. After careful review, we conclude that the manner in which Act 80 was passed by the General Assembly violated Article III, Section 4 of the Pennsylvania

---

[1] Act of Jun. 30, 2012, P.L. 668, No. 80.

[2] Article III, Section 1, entitled "Passage of laws," provides:

> No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

Pa. Const. art. III, § 1.

[3] Article III, Section 3, entitled "Form of bills," provides:

> No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

Pa. Const. art. III, § 3.

[4] Article III, Section 4, entitled "Consideration of bills," provides, in relevant part:

> Every bill shall be considered on three different days in each House.

Pa. Const. art. III, § 4.

Constitution. Accordingly, we reverse the order of the Commonwealth Court upholding its constitutionality, and strike Act 80 in its entirety.[5]

## I. Background

To fully understand the constitutional issues presented by this appeal requires a review of the legislative history of Act 80, which is a matter of public record and not in dispute. In the 2011 session of the General Assembly, a three-page bill was introduced in the House of Representatives on April 1, 2011, designated as H.B. 1261, P.N. 1385.[6] The bill's two provisions: (1) amended Sections 402 and 432.2 of Article IV of the Public Welfare Code,[7] which set eligibility criteria for individuals to receive "assistance,"[8] by defining the terms "applicant," "recipient," and "residence";[9] and (2) required DPW to utilize the residence of an applicant when determining his or her initial eligibility for assistance, as well as when conducting the mandated biennial recertification of the eligibility of an individual to continue to receive such benefits.[10]

This bill was referred to the House Committee on Health, which subsequently reported it out of committee for consideration by the full House. H.B. 1261, P.N. 1385 was then considered by the full House on three separate days: April 5, April 11, and April 12, 2011. Subsequently, H.B. 1261, P.N. 1385 was sent to the Senate on April 25,

---

[5] Because of this ruling, we need not address Appellants' additional claims that the manner of passage of Act 80 also violated Article III, Sections 1 and 3 of the Pennsylvania Constitution.

[6] The bill's brief title indicated that it was an act which amended the Public Welfare Code "in public assistance, further providing for definitions and for determination of eligibility." H.B. 1261, P.N. 1385.

[7] 62 P.S. § 401, *et seq.* In 2015, the Public Welfare Code was renamed the "Human Services Code."

[8] The Public Welfare Code defines "[a]ssistance" to be "money, services and payment for medical coverage for needy persons who are residents of Pennsylvania, are in need of assistance and meet all conditions of eligibility." 62 P.S. § 402.

[9] H.B. 1261, P.N. 1385 § 1.

[10] *Id.* § 2.

2011, and referred to that body's Public Health and Welfare Committee, whereupon it languished, undisturbed, for over 13 months. During this same time period, however, the *entirety* of the language of this bill was included as an amendment to a separate piece of legislation, which ultimately was signed into law on June 30, 2011 as Act 22 of 2011.[11]

On June 5, 2012, the Senate Health and Welfare Committee revived H.B. 1261, P.N. 1385 from its state of dormancy, designated it H.B. 1261, P.N. 3646, removed *all* of the bill's prior language — which, again, by this time had already been enacted into law — and inserted in its place a variety of provisions.[12] These provisions:

- amended 432.2 of Article IV of the Public Welfare Code by including two minor grammatical alterations to the new eligibility requirements for the receipt of assistance which were enacted via Act 22 of 2011;[13]

- amended Article VII of the Public Welfare Code, the "Adoption Opportunities Act," to define a "child," for whom an adoptive family can receive subsidies for maintenance expenses until the child attains the age of 21, provided the child meets certain eligibility criteria;[14]

- amended Article XIII of the Public Welfare Code, the "Kinship Care Program," to require notification to grandparents and other adult relatives of parents, or stepparents of a dependent child, in the event of the child's removal by county authorities from the parental home; the furnishing of information to those individuals about opportunities for them to become foster parents, permanent legal custodians, or adoptive parents; and

---

[11] 62 P.S. §§ 402, 432.2(b), (c).

[12] This bill's newly expanded title stated that it was an act amending the Public Welfare Code "in public assistance, further providing for determination of eligibility; IN CHILDREN AND YOUTH, FURTHER PROVIDING FOR DEFINITIONS; AND IN KINSHIP CARE, FURTHER PROVIDING FOR DEFINITIONS AND FOR KINSHIP CARE PROGRAM, PROVIDING FOR SUBSIDIZED PERMANENT LEGAL CUSTODIANSHIP PROGRAM AND FOR PERMANENT LEGAL CUSTODIANSHIP SUBSIDY AND REIMBURSEMENT." H.B. 1261, P.N. 3646 (capitalization original).

[13] *See* H.B. 1261, P.N. 3646, § 1 (changing "Insure" to "Ensure" and adding the phrase "or recipient's" to "applicant's" in specifying the residence which DPW must assess the conditions of prior to awarding benefits).

[14] *Id.* § 2.

permitting "kin," defined by the amendment as godparents, members of a Native American child's tribe, or any individual over 21 "with a significant, positive relationship with the child or family," to receive placement of a child who has been removed from the parental home;[15] and

- amended Article XIII of the Public Welfare Code to create a new "Subsidized Permanent Legal Custodianship Program" to reimburse the child care expenses of all individuals who are functioning, pursuant to court order, in the capacity of "eligible permanent legal custodian" of an "eligible child," as defined in the amendment, and authorized DPW to establish criteria and promulgate regulations under which county human service agencies were to implement this program.[16] [17]

This newly-constituted bill, now numbering nine pages, was reported out of the Senate Health and Welfare Committee on June 5, 2012, and considered for the first time by the full Senate that same day. H.B. 1261, P.N. 3646 was then considered a second time by that body on June 6, 2012 — after which it was referred to the Senate Appropriations Committee.

However, revisions to this bill were not yet complete. While H.B. 1261, P.N. 3646 was in the Senate Appropriations Committee, it, once more, underwent substantial transformation. Although the Appropriations Committee kept all of the language of H.B. 1261, P.N. 3646, it re-designated the bill H.B. 1261, P.N. 3884,[18] and added new

---

[15] *Id.* §§ 3, 4.

[16] In 2015, the legislature amended the Kinship Care Program to: alter the definition of "Eligible permanent legal custodian"; define "sibling" and require that parents who have legal custody of the sibling of a dependent child be notified of the removal of the dependent child from the parental home and given the opportunity to receive placement of the dependent child; and create an additional category of permanent legal custodian who is eligible to receive subsidies for the care of a dependent child, a "successor permanent legal custodian." *See* Act of December 28, 2015, P.L. 500, No. 92, 62 P.S. §§ 1302, 1303, 1303.2 (effective December 28, 2015).

[17] H.B. 1261, P.N. 3646, § 5.

[18] The title of this bill had, by this time, grown substantially, and it now provided that it was amending the public welfare code for the following purposes:

> IN GENERAL POWERS AND DUTIES OF THE DEPARTMENT OF PUBLIC WELFARE, PROVIDING FOR COUNTY HUMAN SERVICES CONSOLIDATED

(continued...)

provisions, which effectuated the following six basic changes to the Public Welfare Code:

- Article II of the Public Welfare Code was amended to add a mandate for all counties in the Commonwealth to prepare plans and reports regarding their use of funds allocated by the General Assembly for services provided under the Pennsylvania Human Services Development Fund Act, services provided under the Pennsylvania Mental Health and Intellectual Disability Act of 1966, behavioral health services, drug and alcohol addiction treatment services provided under the Administrative Code of 1929, services to the homeless, and services furnished by county child welfare agencies;[19]

- a new Pilot Block Grant Program was created in which counties would be allocated a lump sum payment from the Commonwealth and given discretion to proportionally allot funds from that payment to the provision of the services enumerated above;[20]

---

(…continued)

PLANNING AND REPORTING; IN PUBLIC ASSISTANCE, FURTHER PROVIDING FOR DEFINITIONS, PROVIDING FOR CESSATION OF THE GENERAL ASSISTANCE CASH PROGRAM AND THE CONTINUATION OF THE GENERAL ASSISTANCE-RELATED MEDICAL ASSISTANCE PROGRAMS, FURTHER PROVIDING FOR ESTABLISHMENT OF RESET, FOR DETERMINATION OF ELIGIBILITY, FOR FAILURE TO COMPLY WITH EMPLOYMENT AND WORK-RELATED ACTIVITY REQUIREMENTS AND FOR MEDICALLY NEEDY AND DETERMINATION OF ELIGIBILITY; IN CHILDREN AND YOUTH, FURTHER PROVIDING FOR DEFINITIONS; IN NURSING FACILITY ASSESSMENTS, FURTHER PROVIDING FOR TIME PERIODS; IN KINSHIP CARE, FURTHER PROVIDING FOR DEFINITIONS AND FOR KINSHIP CARE PROGRAM, PROVIDING FOR SUBSIDIZED PERMANENT LEGAL CUSTODIANSHIP PROGRAM AND FOR PERMANENT LEGAL CUSTODIANSHIP SUBSIDY AND REIMBURSEMENT; PROVIDING FOR HUMAN SERVICES BLOCK GRANT PILOT PROGRAM; AND MAKING RELATED REPEALS.

H.B. 1261, P.N. 3884 (capitalization original).

[19] H.B. 1261, P.N. 3884, § 1.

[20] Id. § 12. In 2016, this program was reenacted as the "Human Services Block Grant Program." This re-enactment retained some of the provisions of the original program, (continued…)

- Article IV of the Public Welfare Code was amended to terminate the cash general assistance program effective August 1, 2012, and to also create a new category of benefits called "General assistance-related categorically needy medical assistance";[21]

- Article IV of the Public Welfare Code was amended to impose new eligibility, work, and work-related requirements on anyone applying for public assistance, those receiving categorically needy medical assistance benefits, and those classified as "medically needy";[22]

- Article IV of the Public Welfare Code was altered to create new disqualification penalties consisting of the interruption and cessation of benefits to individuals who do not comply with any mandated work requirements;[23]

- Article VIII of the Public Welfare Code was amended by extending until 2016 a financial levy on nursing homes — the Nursing Facility Assessment Program, which was set to expire on June 30, 2012.[24]

The revised bill, which had now grown to 27 pages, was reported out of the Appropriations Committee on June 29, 2012 and passed by the full Senate that same day. Also that same day, H.B. 1261, P.N. 3884 was sent to the House and immediately referred to the Rules Committee, which, after a brief review, transmitted it to the full House. The very next day, June 30, 2012, the House passed H.B. 1261, P.N. 3884 by a final tally of 102-91. Governor Thomas Corbett signed H.B. 1261, P.N. 3884 later that

---

(…continued)
but restructured the manner in which funds were allocated, and how the program was administered by DPW and counties which voluntarily elected to participate. *See* Act of Nov. 4, 2016, P.L. 1172, No. 153, 62 P.S. §§ 1402B-1410B (effective July 1, 2017). Our decision in this matter does not affect the validity of this re-enactment.

[21] H.B. 1261, P.N. 3884, §§ 2-3.

[22] *Id.* §§ 4-5.

[23] *Id.* § 6.

[24] *Id.* § 8. Under this assessment, all licensed county and private nursing homes are charged a fee per resident. The fees are then utilized by DPW to obtain matching federal funds. The aggregate monies received are then distributed to nursing facility providers which care for patients receiving medical assistance. 43 Pa. Bull. 1936.

same day, at which point it became Act 80 of 2012, and, according to its terms, took effect on July 1, 2012.

Appellants commenced an action in the Commonwealth Court's original jurisdiction claiming, *inter alia*, that the manner in which this bill was passed by the legislature violated Article III, Sections 1, 3, and 4 of the Pennsylvania Constitution.[25] The Commonwealth Court assigned Senior Judge Quigley to hear the case, and he conducted a hearing on October 23, 2012, restricted to the question of whether Appellants were entitled to the entry of a preliminary injunction. Following the hearing and oral argument, he denied Appellants' request for preliminary injunctive relief. *Washington v. Department of Public Welfare*, No. 602 M.D. 2012 (Pa. Cmwlth. Oct. 25, 2012) (unpublished order). Subsequently, DPW proceeded with implementation of Act 80.

Appellants filed a direct appeal with our Court of the order denying the preliminary injunction. Our Court affirmed the denial of the injunction by *per curiam* order on September 25, 2013. *Washington v. Department of Public Welfare*, 76 A.3d 536 (Pa. 2013) (order). The matter returned to the Commonwealth Court which was, at that time, still considering DPW's demurrer to Appellants' petition for declaratory and permanent injunctive relief.

On June 24, 2013, an *en banc* panel of the Commonwealth Court granted DPW's demurrer as to Appellants' claims under Article III, Sections 1, 3, and 4, but overruled

---

[25] Initially, because of the inclusion of the nursing facility assessment provisions in Act 80, the Pennsylvania Health Care Association ("PHCA"), which is a trade association representing, *inter alia*, nursing homes, intervened in the proceedings before the Commonwealth Court. However, because Section 8 of Act 80 expired on June 30, 2016, and new legislation was enacted which continued this assessment until June 30, 2019, *see* 62 P.S. § 801-A, PHCA discontinued its intervention in this matter and is no longer a party.

DPW's demurrer as to Appellants' challenges to the legislation under Article III, Section 24, Article II, Section 1, and the Commonwealth Documents Law. Thereafter, the parties proceeded with discovery on those remaining claims. However, nearly three years later, in March 2016, Appellants discontinued their challenges under these other constitutional and legal provisions, and the Commonwealth Court entered final judgment in favor of DPW on Appellants' outstanding claims on March 28, 2016. Thus, those claims are not before us in the present appeal.

In its opinion accompanying the granting of DPW's demurrer, the Commonwealth Court explained its rationale for dismissing Appellants' claims under Article III, Sections 1, 3, and 4 of the Pennsylvania Constitution. *Washington v. Department of Public Welfare*, 71 A.3d 1070 (Pa. Cmwlth. 2013) (*en banc*).[26] That tribunal first addressed Appellants' claim that Act 80 violates Article III, Section 1 of our Constitution, which bars the addition of amendments unrelated to a bill's original purpose during the legislative process. The court looked to our decision in *Pennsylvanians Against Gambling Expansion Fund Inc. v. Commonwealth of Pennsylvania*, 877 A.2d 383, 409 (Pa. 2005) ("*PAGE*"), as setting forth the governing standards for assuring that legislation comports with this constitutional provision: (1) the original purpose of the legislation will be compared to its final purpose and there must be no "alteration or amendment so as to change the original purpose;" and (2) the court considers "whether in its final form, the title and contents of the bill are deceptive." *Id.* at 408-09. Since Appellants did not allege deceptiveness in the title of Act 80, the court examined only whether the first

---

[26] The Commonwealth Court opinion was authored by then-Judge, now-President Judge Leavitt, and joined, in full, as to the three issues we are presently considering, by then-President Judge Pellegrini, and Judges McGinley, Leadbetter, Cohn-Jubelirer, Brobson and McCullough. Judge Leadbetter noted her dissent without opinion as to two of Appellants' mooted claims.

requirement of *PAGE* had been met. In conducting this analysis, the Court relied on our pronouncement therein that, in determining a bill's purpose, it was permissible for a reviewing court to "hypothesize, based upon the text of the statute . . . a reasonably broad original purpose." *Washington*, 71 A.3d at 1080 (quoting *PAGE*, 877 A.2d at 409). The Commonwealth Court found that the purpose of Act 80 had not changed from its initial version to the final version, inasmuch as both versions related to "the regulation and funding of human services programs regulated by [DPW]," *id.* at 1080; thus, that tribunal concluded that Act 80 did not violate Article III, Section 1.

Next, the Commonwealth Court considered whether Act 80 violated Article III, Section 3 of the Pennsylvania Constitution — the "single subject rule" — which mandates that each bill passed by the General Assembly pertain to only one subject. Again, following the teachings of *PAGE*, the court looked for a unifying subject amongst the various provisions of Act 80. Reasoning that all of the health and human services programs covered by Act 80 work like "parts of a single machine" such that a change to one human services program will affect the others, the court concluded that the multifaceted elements of Act 80 could all be unified under the common theme of "improving the effectiveness and efficiency of the delivery of human services programs to people in need." *Id.* at 1082. Consequently, the court found Act 80 did not violate Article III, Section 3.

Finally, the Commonwealth Court considered whether Act 80 violated Article III, Section 4. The court characterized that constitutional provision as requiring three "readings" of a bill in each house of the General Assembly.[27] *Id.* at 1083. While noting

---

[27] As discussed at greater length herein, the version of Article III, Section 4, adopted by the framers of our Commonwealth's 1874 "Reform Constitution" and subsequently ratified by the electorate, required an actual verbatim reading of a bill out loud in each House three separate times. This requirement was altered in 1967 such that both (continued...)

that H.B. 1261, P.N. 1385 had been "considered" on three separate days in the House – April 5, 11, and 12 of 2011 – it found that H.B. 1261, P.N. 3884 was "read" only once in the Senate, on June 29, 2012, before its final passage by that body. Nevertheless, the court did not find these circumstances to constitute a violation of Article III, Section 4. Relying on our decision in *Stilp v. Commonwealth*, 905 A.2d 918, 959 (Pa. 2006) (holding that "a bill does not have to be considered on three separate days, as otherwise required by Article III, Section 4, if the amendments to the bill added during the legislative process are germane to and do not change the general subject of the bill" – the same requirements an amended bill must meet in order to comport with the requirements of Article III, Sections 1 and 3), the court concluded that, because it had determined that Act 80 did not violate either Article III, Section 1 or Section 3, there was, correspondingly, no violation of Article III, Section 4. Appellants took a direct appeal to our Court from the Commonwealth Court's final order entered March 28, 2016, and in this appeal presently renew their contentions that the manner in which the legislature enacted Act 80 violates Article III, Sections 1, 3, and 4 of the Pennsylvania Constitution.

## II. Historical and Legal Background of Article III

Since our Court regards the language of our Constitution as the embodiment of the will of the voters who adopted it, *Stilp,* 905 A.2d at 939, it is instructive to begin our consideration of Appellants' challenges with a brief history of the circumstances which caused the people to include Sections 1, 3, and 4 in Article III of our organic charter of governance, as well as the fundamental purposes which the people intended these amendments to serve. *See Scarnati v. Wolf,* 173 A.3d 1110, 1118 (Pa. 2017)

---

(...continued)
Houses are now required to "consider" a bill three times, but the entire text of the bill no longer needs to be read out loud as part of that consideration process.

(observing that, in interpreting the Pennsylvania Constitution, "[w]e should . . . consider the circumstances attending its formation and the construction probably placed upon it by the people." (internal quotation marks omitted)).

By the time of the Civil War, large corporations, particularly the railroads, and other wealthy special interest groups and individuals had acquired such influence over the General Assembly that they routinely secured the passage of legislation which exclusively served their narrow interests to the detriment of the public good. Thomas Raeburn White, *Commentaries on the Constitution of Pennsylvania*, xxvi (1907) (hereinafter "White"). As a result, during the decade after that conflict ended, the populace became increasingly dissatisfied with the manner in which the General Assembly was functioning, such that the people lost confidence in the legislature's ability to fulfill its most paramount constitutional duty of representing their interests. *See* Mahlon Hellerich, *The Pennsylvania Constitution of 1873*, 157 (1956) (Ph.D. dissertation, University of Pennsylvania) (on file with University of Pennsylvania) (hereinafter, "Hellerich") (observing that the legislature was regarded at that time "as the tool of special interests, as controlled by lobbyists or 'borers,' as filled with corrupt, self-serving men who sold their votes to the highest bidder, as composed of men who practiced extortion upon legitimate businessmen").

The public's dissatisfaction with the General Assembly was fueled in great measure by "abuses and inadequacies in the lawmaking process" which were prevalent at the time. *Id.* at 167. Such abusive legislative practices included:

> the passage of local and special laws to confer special benefits or legal rights to particular individuals, corporations, or groups, benefits which were not afforded the general public; deceptive titling of legislation to mask its true purpose; the mixing together of various disparate subjects into one omnibus piece of legislation; and holding quick votes on legislation which had been changed at the last

minute such that its provisions had not been fully considered by members of both houses.

*Nextel Communications of Mid Atlantic Inc. v. Commonwealth, Department of Revenue,* 171 A.3d 682, 694 n.14 (Pa. 2017).

Further, as ably recounted by Professor Hellerich, "[m]embers of the legislature failed to respect the rules of procedure in acting upon various bills and failed to provide safeguards against theft or fraudulent insertion in the transmission of bills between both houses or from the legislature to the governor," such as a requirement that bills be read before they were passed. Hellerich at 167; *see also Pennsylvania Constitutional Convention 1967–68,* Ref. Manual No. 1, at 5 (noting that "legislative procedure had gotten sloppy and sometimes was grossly disregarded," which resulted, *inter alia,* in "hasty amendments of the most important character . . . being adopted without those amendments being read").[28]

This lack of protection for the transparency of the legislative process enabled various legal provisions, usually crafted for the benefit of a particular corporation, special interest group, or individual, to be surreptitiously inserted into a lengthy bill, often just before the final vote on it without all members of the General Assembly being aware of those provisions when voting on it. The General Assembly's failure to adhere to standards of regularity in the legislative process resulted in the degradation of the integrity of legislative enactments to such a degree that newspapers of the day observed that "it occasionally occurs that . . . proposed legislation is . . . wholly perverted from its true intention, and the perversion is not discovered until the bill has

---

[28] The Preparatory Committee for the Constitutional Convention of 1967-1968 created nine reference manuals to give delegates information on a variety of subject areas to assist them in their deliberations, which included the historical circumstances surrounding the adoption of prior versions of the Pennsylvania Constitution.

become a law by the signature of the Governor, hastily secured by some convenient friends." Hellerich at 167.

The public clamor for an end to these practices became so intense that, in 1873, the voters overwhelmingly approved, by a margin of 5-1, the holding of a constitutional convention for the twin purposes of reforming the legislative process and the outlawing of all special legislation. *Pennsylvania Constitutional Convention 1967–68*, Ref. Manual No. 1, at 5. To end the aforementioned abuses, and to ensure that, thereafter, regular procedures would be followed by the General Assembly in the passage of all legislation, the delegates to the 1873 convention adopted, and the voters approved in 1874, Article III of the Pennsylvania Constitution. Each of Article III's provisions was specifically designed to eliminate one of the myriad objectionable legislative practices the Commonwealth's citizenry viewed with intense disfavor.

Relevant to the case *sub judice*, Article III, Section 1 was newly adopted by the 1873 convention and intended to abolish the practice of attaching "riders" to bills at various points in the legislative process by barring the addition of proposed legislation on a subject matter unrelated to that of the bill as originally introduced. White at 211. Thus, its objective was to give legislators considering a bill sufficient notice of all of its provisions so that "they might vote on it with circumspection." *Consumer Party of Pennsylvania v. Commonwealth*, 507 A.2d 323, 334 (Pa. 1986).

Article III, Section 3, was crafted to prevent the use of "omnibus bills" which combined multiple pieces of legislation, each pertaining to a different subject, into one bill.[29] White at 213. Limiting each bill to a single subject matter serves to ensure that

---

[29] Popular anger at the misuse of omnibus bills "to put through enactments which were not at all understood, under the cloak of other and better measures incorporated into the same bill," had swelled to such a degree by 1863 that, in response, the restrictions of Article III Section 3 were passed by the legislature and approved by the voters in 1864 as an amendment to the 1838 constitution. White at 214. That amendment read, "[n]o (continued...)

every piece of legislation receives a "considered and thorough review" by legislators, and it safeguards the ability of all residents of the Commonwealth who will be impacted by a bill to have the opportunity to make their views on its provisions known to their elected representatives prior to their final vote on the measure. *Commonwealth v. Neiman*, 84 A.3d 603, 612 (Pa. 2013).

The version of Article III, Section 4 adopted by the 1873 convention and passed by the electorate in 1874 required every bill to be "read at length on three different days in each House." Pa. Const. of 1874, art. III, § 4. This was intended to prevent the secret insertion of provisions into a bill, prior to legislators' deliberations and voting on it, which they were unaware of, and, thus, was meant to assure that each legislator would have knowledge of, and the corresponding opportunity to fairly consider in an informed fashion, all aspects of any legislation he or she was asked to approve. White at 211.

Our Court has recognized that, consistent with the intent of the electorate who ratified the 1874 Constitution, the overarching purpose of these and the other restrictions on the legislative process contained in Article III was to furnish essential constitutional safeguards to ensure our Commonwealth's government is open, deliberative, and accountable to the people it serves. *City of Philadelphia v. Commonwealth*, 838 A.2d 566, 585 (Pa. 2003); John L. Gedid, "*History of the Pennsylvania Constitution*" as appearing in Ken Gormley, ed., *The Pennsylvania*

---

(...continued)
bill shall be passed by the legislature, containing more than one subject, which shall be clearly expressed in the title, except appropriations bills." Pa. Const. of 1864, art. II, § 8. The 1873 convention moved the phrase "except appropriations bills" from the end of the clause in the amendment to modify "bill," for perceived grammatical clarity, but the delegates emphasized in their discussions of this amendment that, in recognition of the reasons for its recent enactment, they were wholly reaffirming its fundamental restrictions on the legislative process. 5 Debates of the Constitutional Convention of 1873, 243-46 (1873).

*Constitution A Treatise on Rights and Liberties*, 68 (2004) ("Requiring a single subject and statement of that subject in the title of a bill, as well as controls on altering bills to change their nature during the passage process without revealing the change, prevented "stealth" legislation in which some legislators might be misled about the contents of a bill, and also enabled the public to know and follow what the legislature was doing."). Such procedural requirements are integral to the preservation of the people's freedom from the yoke of secretive laws passed without full public awareness and debate. *See Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring) ("The history of American freedom is, in no small measure, the history of procedure."). Consequently, as these provisions are mandatory constitutional directives from the people, not mere advisory guidelines, the General Assembly must comply with them in the course of the legislative process. *City of Philadelphia*, 838 A.2d at 581. For the same reason, "the judicial branch cannot ignore a clear violation because of a false sense of deference to the prerogatives of a sister branch of government." *Consumer Party*, 507 A.2d at 334.

Article III, Section 1 has remained unchanged since its inclusion in the 1874 Constitution. Article III, Section 3 was slightly altered in our present (1968) Constitution to permit bills to contain multiple subjects if they merely codify or compile extant laws or parts of laws, but this alteration did not weaken the amendment's firm prohibition on legislation covering different subject matters being passed in a single omnibus bill. Pa. Const., art. III, § 3.

Article III, Section 4 was changed in 1967 when voters approved an amendment passed by the General Assembly that deleted the requirement that every bill be "read at length on three different days in each House," and replaced it with a requirement that

every bill be "considered on three different days in each House."[30] The impetus for such a change arose from the sizable increase in both the volume and diversity of the subject matter of bills annually introduced into the General Assembly since the time of Article III, Section 4's original adoption. By 1959, when changes to this amendment were first being considered, the sheer number of bills the legislature was considering during each session rendered the reading, out loud, of the full length of each of them on three different days an impracticably cumbersome and time-consuming process. *See* Pennsylvania Commission on Constitutional Revision, *Report*, at 63 (1959).

Significantly, however, when the legislature adopted the amendment revising Article III, Section 4 in 1966, it rejected an effort to shorten the "three different days" requirement, even in situations when the Commonwealth is facing nuclear war, natural disaster, or a national emergency. House Legislative Journal, 2881 (1966). As originally proposed, the amendment would have allowed waiver of the "three different days" requirement if 90 percent of the members of each House declared it to be an "emergency measure"; whereupon, it could then be passed by each House after only one day of consideration. *Id.* This waiver provision was stricken from the amendment by the General Assembly after debate, during which the proponents of its removal stressed the integral role the "three different days" requirement plays in the proper functioning of the legislative process.[31] In their view, this rule ensured that legislators were made fully aware of all the components of any bill they were being asked to vote on, in order to make certain that they fully and thoroughly considered the merits and

---

[30] Although reading of bills is no longer mandatory after this change, members of either House can still have a bill read at length if they submit a petition to the presiding officer of the chamber in which the bill is being considered which is signed by 25 members of that chamber.

[31] This debate occurred during the constitutionally mandated second and third days of reading of the amendment.

effect of each part thereof, and it gave legislators necessary time to improve the bill by offering amendments.

As noted by Representative Stauffer, the author of the amendment to remove the emergency waiver provision:

> The ["three different day"] restriction that has appeared in our constitution has served a very valuable purpose, because it has enabled each member to become alerted to the possible bad features of any legislation offered, and during the years that this has existed, we have found it a great tool to use in effecting proper amendments and in the enactment of good legislation . . . . Certainly we see the need for the opportunity to study and consider legislation and certainly we realize that many times errors, whether they be technical errors or very serious errors, occur in some of our legislation. The fact that we spend three days considering it enables us to pass legislation which is of much better character and certainly much more effective.

House Legislative Journal, 2881, 2929 (1966); *see also* House Legislative Journal, 2881 (Remarks by Representative Gelfand) ("At times, the only protection that one has who desires to give full consideration of legislation is the fact that legislation must go through this body on three separate days and receive three days of consideration."). Thereafter, the House approved the removal of the emergency waiver provision on a vote of 110-89, and the Senate unanimously concurred. Article III, Section 4, with its current explicit requirements that every bill be considered by each house of the General Assembly on three different days, was then ratified by the voters in May 1967.

It is apparent that, despite this change in its language, Article III, Section 4 continues to serve the same critical purpose as it did at its inception — namely, ensuring an open and deliberative legislative process in which all legislators are given a full opportunity to scrutinize a bill and offer changes which they may deem necessary, and to also make certain that, during this process, every member of the public has the

opportunity to make his or her views known to their representatives and senators on all provisions of a bill before its final passage.

For the following reasons, we conclude that the manner in which the General Assembly passed Act 80 contravenes the requirements of Article III, Section 4.

### III. Analysis.

As detailed above, and discussed *infra*, the three versions of H.B. 1261 — P.N. 1385, 3646, and 3884 — each contained significantly dissimilar provisions, and no one version of this bill containing all of the provisions of Act 80 was considered by either the House or the Senate on three separate days; thus, under these circumstances, we perceive the paramount constitutional question for our consideration to be whether the requirements of Article III, Section 4 were complied with during the legislative process.

As this matter comes to us as an appeal from the Commonwealth Court's order granting a demurrer, we are required to accept as truthful all well-pleaded material facts and all inferences fairly deducible from those facts. *Robinson Township v. Commonwealth*, 83 A.3d 901, 987 (Pa. 2013). Whenever it is the defendant who is the moving party, we may affirm the grant of the demurrer only if the plaintiff is not entitled to relief as a matter of law. *Id.* Inasmuch as a constitutional challenge is a pure question of law, our review is plenary; thus, we need not defer to a lower court's resolution of this issue. *Id.* (quoting *Pennsylvania Turnpike Commission v. Commonwealth*, 899 A.2d 1085, 1094 (Pa. 2006)).

We are also guided in our review by the "presumption that our sister branches take seriously their constitutional oaths." *Stilp*, 905 A.2d at 938. Consequently, legislation enjoys a presumption of constitutionality, which extends to the manner in which it was passed. *Neiman*, 84 A.3d at 611. A statute is, therefore, presumed valid, and it will not be found unconstitutional unless it "clearly, palpably, and plainly violates

the Constitution." *Id.* For that reason, the burden of proof for any litigant seeking to meet this standard is high, and any doubts will be resolved in favor of a finding of the statute's constitutionality. *Id.*

As discussed *supra*, in interpreting a constitutional provision, we view it as an expression of the popular will of the voters who adopted it, and, thus, construe its language in the manner in which it was understood by those voters. *Stilp*, 905 A.2d at 939; *Commonwealth v. Harmon*, 366 A.2d 895, 899 (Pa. 1976). As a result, we do not consider such language in a "technical or strained manner, but are to interpret its words in their popular, natural and ordinary meaning." *Scarnati*, 173 A.3d at 1118. Accordingly, "we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter." *In re Bruno,* 101 A.3d 635, 659 (Pa. 2014) (quoting *Commonwealth ex rel. Paulinski v. Isaac*, 397 A.2d 760, 766 (Pa. 1979)).

As we have emphasized previously, "[o]ur ultimate touchstone is the actual language of the Constitution itself." *Stilp*, 905 A.2d at 939. The language of Article III, Section 4 is direct and unequivocal, "[e]very bill shall be considered on three different days in each House." Pa. Const. art. III, § 4. The term "bill" refers to a piece of legislation which includes, in its entirety, all the language of a proposed law which the General Assembly is being asked to consider and take official action on. *See Scudder v. Smith*, 200 A. 601, 604 (Pa. 1938) ("A bill is the draft or form of an act presented to the legislature, but not enacted."). Accordingly, we initially reject any contention that, merely because a bill designated "H.B. 1261" was considered by each House on three separate days, Article III, Section 4 was necessarily satisfied.

To the contrary, we read the three-day consideration requirement in accordance with the above-discussed intent of the framers and the wishes of the voters who

approved it — to secure an open and deliberative legislative process in which the public has the opportunity to become aware of pending legislation and express their views on it to their elected representative. Thus, we view this obligation as a mandate that the substantive contents of a bill – i.e., the specific language or other means by which the bill will change or supplement the Commonwealth's existing laws – be considered on three different days, so that every legislator and all members of the public are fully apprised of how the laws of Pennsylvania will be altered by the bill. Therefore, the dispositive constitutional question is whether each House considered on three separate days a version of H.B. 1261 which contained the same substantive provisions enacted into law as Act 80.[32]

Hence, while it is true that the first version of H.B. 1261, P.N. 1385 was considered by the House on three separate days in 2011 (April 5, April 11, and April 12), the initial substantive provisions of this bill – requiring the use of residency as an eligibility factor for the receipt of public assistance benefits – were not, facially, the same substantive provisions contained in the latter two versions of the bill which was considered by the Senate, H.B. 1261, P.N. 3646 and 3884. Indeed, as recounted above, *all* of the provisions of H.B. 1261, P.N. 1385 which had been considered by the House on those three days in 2011 became the subject of another entirely separate piece of legislation that was enacted in 2011 as Act 22. Thus, when those provisions became law, H.B. 1261, P.N. 1385, which was at that time reposing in the Senate

---

[32] Indeed, were we to construe Article III, Section 4 as requiring only that the same numbered bill be passed three times by each House, it would allow, for example, both Houses to twice pass an identically numbered bill entirely devoid of any content, permit one House to insert a limitless number of substantive provisions into the empty bill, and then have that bill, so long as it has the same number as the first two empty bills, approved by a single vote of both Houses in order for it to be sent to the governor for signature and enactment into law. Such a *pro forma* process would clearly defeat the fundamental purposes Article III, Section 4 was intended to serve.

Public Health and Welfare Committee, ceased to be active legislation, as all of its substantive provisions had already been considered and acted upon by the General Assembly. It was then, in every respect, a nullity.

However, the Senate Public Health and Welfare Committee gutted all of the provisions of the bill and inserted into its now hollow shell the distinct provisions of H.B. 1261, P.N. 3646. As described above, this reanimated "zombie" bill now addressed the facially different subjects of amending the Adoption Opportunities Act to provide subsidies for adoptive parents, altered the notification and custodianship criteria for kin of dependent children, and created an entirely new program to provide a monetary payment to those individuals who were granted permanent legal custodianship of a dependent child. *See supra* pp. 4-5. The only reference H.B. 1261, P.N. 3646 made to the substantive provisions of P.N. 1385 was regarding two minor grammatical alterations to the provisions already enacted by Act 22 of 2011. After being reported out of the Senate Health and Welfare Committee, H.B. 1261, P.N. 3646 was considered twice by the full Senate, but not at all by the House.

Further, after H.B. 1261, P.N. 3646 was referred to the Senate Appropriations Committee, six additional disparate substantive provisions were added to this legislation in that committee, as described at length above. *See supra* pp. 5-7. This expansive bill, now designated H.B. 1261, P.N. 3884, was reported out of the Senate Appropriations Committee on June 29, 2012 and considered once by the Senate, which voted to approve it that day. It was considered once by the House on June 30, 2012, when that body voted to approve it, and then it was signed into law verbatim by Governor Corbett later that same day as Act 80. It is plain, then, that neither the House nor the Senate considered the substantive provisions facially enumerated in Act 80 three times.

Even so, our Court has never held that absolute conformity in a bill's language from its first consideration to its third and final consideration is required in order for Article III, Section 4's requirements to be met. Due to the fundamental nature of standard legislative practice, a regular part of which is the offering of amendments by legislators to change a bill's language, or the insertion and deletion of various provisions, it is expected that a bill will undergo some changes during the course of its passage through each House of the General Assembly. Thus, in assessing a claim that the procedure used to pass a bill violated Article III, Section 4, we have traditionally employed a "germaneness" test which affords due regard for the necessity of preserving flexibility in the legislative crafting process, while maintaining the strength of the safeguards for the regularity and transparency of this process afforded by Article III, Section 4.

This test requires examination of the original subject of the bill and then a determination of whether "the amendments to the bill added during the legislative process are germane to and do not change the general subject of the bill." *Stilp*, 905 A.2d at 959; *Pennsylvania School Boards Association, Inc. v. Commonwealth Association of School Administrators*, 805 A.2d 476, 488 (Pa. 2002).[33] The subject of a bill's original provisions and subsequent amendments must, of course, be ascertained from the language of both. Consequently, only when amendments are germane to the bill's original subject will consideration of the original bill by each House on a particular day count towards the requirements of Article III, Section 4. Such a requirement allows

---

[33] Our Court utilizes the same germaneness test to determine whether the manner of passage of a bill violates Article III, Section 1 and Article III, Section 3; thus, a finding that amendments to a bill made during the legislative process are not germane to the subject of its original provisions will also support a determination that the bill's passage violated these constitutional provisions as well. *Stilp*, 905 A.2d at 909; *PAGE*, 877 A.2d at 410.

for ordinary amendments to a bill that do not change its original subject, but prevents legislation of a different subject matter being added to a bill late in the legislative process and then passed without the three days' consideration by each House mandated by Article III, Section 4.

Amendments are germane to the original general subject matter of a bill if both the subject of the amendments and the subject of the original contents of the bill "have a nexus to a common purpose." *Neiman*, 84 A.3d at 612.[34] In other words, the subject of the amendments and the subject of the original bill language must constitute "a unifying scheme to accomplish a single purpose." *Id.* (quoting *City of Philadelphia*, 838 A.2d at 589). In making this determination, a reviewing court may hypothesize a "reasonably broad" unifying subject; however, such a hypothetical subject cannot be unduly expansive, lest the purpose of the constitutional provision be defeated. *Id.* The parties in this matter focus their arguments on the question of whether the Senate amendments to H.B. 1261 passed in 2012 were germane to this bill's original general subject matter as introduced and passed by the House in 2011.

Appellants argue that the requirements of Article III, Section 4 have not been met because the final version of H.B. 1261 which became Act 80 — H.B. 1261, P.N. 3884 — was not considered on three different days by both the House and Senate. Appellants point to the fact that the House considered this final version only on one day — June 30, 2012 — when that chamber voted, by a bare one vote majority of its sitting membership, to enact it. The three prior votes the House had taken over 13 months earlier — on April

---

[34] Although *Neiman* and *City of Philadelphia* articulated the criteria for germaneness in the context of an Article III, Section 3 challenge, given that the dispositive inquiry in application of the germaneness test in such a challenge is the same — *i.e.*, whether component parts of legislation pertain to the same subject matter — we consider it equally applicable to an Article III, Section 4 challenge.

5, 11, and 12, 2011 — were on the first version of the bill — H.B. 1261, P.N. 1385 — which did not contain the final bill's panoply of subjects, but, rather, contained only the public assistance residency requirements. Appellants contend that the Senate, likewise, did not consider H.B. 1261, P.N. 3884 on three separate days, as, prior to its vote on the final version, it had twice considered only the second version of the bill — H.B. 1261, P.N. 3646 — which contained only the adoption/foster parent subsidy and guardianship provisions which had been inserted after the residency requirements had been stripped out.

Appellants acknowledge our Court's holding in *PAGE* that an amended bill does not have to be referred to a committee and considered on three separate days if such amendments are germane to the original general subject of the bill and do not wholly change that subject. However, Appellants dispute that the provisions which were included in the final version of H.B. 1261 that was passed only once by the House and Senate were germane to the original subject of H.B. 1261. Appellants point out that the original version of H.B. 1261, P.N. 1385 contained only the public assistance residency requirements; however, neither the adoption and guardianship subsidies contained in H.B. 1261, P.N. 3646, nor the Pilot Block Grant Program, the welfare to work requirements and noncompliance penalties, the elimination of General Assistance cash benefits, or the extension of the Nursing Home Assessment contained in H.B. 1261, P.N. 3884, were germane to those residency requirements.

Appellants aver that the true purpose of H.B. 1261 was to function as a:

> "vehicle bill" used as the fiscal year was rapidly drawing to a close. Its sole purpose was to serve as a vehicle to adopt a wide-ranging, controversial legislative agenda, including assuring that the Commonwealth did not lose close to a billion dollars in funding for nursing home care.

H.B. 1261 was selected as the bill for these wide-ranging revisions not because it contained germane provisions . . . but because it had already been passed on three days in the House and on two days in the Senate.

Appellants' Brief at 38. Appellants contend that the use of such last minute "vehicle bills" circumvents the core requirement of Article III, Section 4 that each piece of legislation receive careful and open consideration, and is "precisely the evil that the framers of the Pennsylvania Constitution meant to prevent." *Id.* at 39.[35]

In response, DPW argues that H.B. 1261's passage comported with the consideration on three separate days requirement of Article III, Section 4. DPW acknowledges the myriad amendments to H.B. 1261, but it maintains that the broad purpose and subject of this bill — the interrelated human services programs administered by DPW — remained constant throughout its various iterations, and all of the amendments related to that purpose. Hence, in its view, as the amendments to H.B. 1261 were all germane to its original purpose, H.B. 1261 did not have to be

---

[35] *Amici*, which are a number of public service and advocacy organizations, and a union representing social service workers, have filed a brief which traces in great detail the history and purposes of Article III. *Amici* emphasize that the binding procedural requirements for the passage of legislation contained in Article III were enacted to ensure that our Commonwealth's lawmaking process reflects the ideals of an open and deliberative democracy with maximum participation by the public, which is critical to ensuring an honest government responsive to the people's needs. *Amici* aver that these requirements "enhance informed participation in the legislative process by elected officials and the public alike." Amici Brief at 12. *Amici* note that these considerations remain of vital importance today, given the multiplicity of bills introduced annually into legislative bodies. *Amici* assert that only by the legislature's strict adherence to these procedural requirements will legislators, and, more importantly, the members of the public, be made aware of the substance of every bill, so that they can exercise their constitutional right to petition the legislature to have their views heard on that subject. *Amici* contend that the abbreviated manner in which the wide assortment of subjects in Act 80, was both considered and voted on by the General Assembly — in a 48 hour period — violated all of the provisions of Article III (Sections 1, 3, and 4) and thwarted the fundamental objectives of that constitutional provision.

considered in its finally amended form three times by each House. Instead, DPW takes the position that, given this germaneness between the amendments and the bill's original purpose, it is proper to count all of the times that a version of H.B. 1261 was passed by the House and Senate, and, therefore, since the House passed a version of H.B. 1261 four times and the Senate three, the requirements of Article III, Section 4 were met.

It is abundantly plain that the peculiar manner in which this legislation was passed is significantly unlike the legislative history of the bills at issue in cases such as *Stilp* and *Pennsylvania School Boards* in which we have previously employed the germaneness test under Article III, Section 4. In those cases, the original provisions of a bill establishing its initial subject remained in the bill from its inception until the end of its journey through each House, and additional amendments pertaining to the same subject matter were added to those original provisions during this process. All of the provisions contained in the final bill were deemed to be germane to each other since they could rationally be viewed as working in concert with one another to effectuate a common purpose.

By contrast, in the case at bar, the provisions of H.B. 1261, P.N. 1385 were *entirely removed* from the bill by the Senate, inasmuch as they had already been enacted by another piece of legislation, Act 22 of 2011. Thus, since the original provisions were gone when the new provisions were added by the Senate, it was factually and legally impossible for the new provisions to work together with the deleted provisions to accomplish a single purpose. Indeed, the purpose the original provisions sought to achieve had already been accomplished by other legislative means. We hold that amendments to such enfeebled legislation are not germane as a matter of law. Consequently, the Senate amendments were not germane to the provisions of H.B.

1261, P.N. 1385, and, accordingly, the three times that H.B. 1261, P.N. 1385 was passed by the House in 2011 cannot count towards the requirements of Article III, Section 4.[36]

---

[36] Even were we to ignore this gross procedural irregularity and conduct a traditional germaneness test — simply contrasting the subject matter of H.B. 1261, P.N. 1385 with that of Act 80 — we would find the amendments inserted by the Senate insufficiently germane under Article III, Section 4. Initially, we simply do not regard the subjects of the multifarious provisions of Act 80 inserted by the Senate to be germane to the subject of setting eligibility criteria for the receipt of assistance based on residence, the sole focus of H.B. 1261, P.N. 1385.

Likewise, we reject the proposed unifying subject for Act 80 offered by the Commonwealth Court, and endorsed by DPW: "the regulation and funding of human services programs regulated by [DPW]," *Washington*, 71 A.3d at 1080. This proposed subject is entirely too expansive, as it involves a wide panoply of human service programs established by a multiplicity of statutes, not all of which are contained in the Public Welfare Code.

Additionally, the nursing home assessment program, which was added at the last minute to Act 80, is solely a revenue raising tax to provide medical assistance benefits for individuals in nursing homes, and, consequently, is unlike the other provisions of Act 80 which, instead, are focused on such disparate topics as: establishing criteria for custodianship of dependent children; authorizing and setting eligibility requirements for the disbursement of money for financial assistance to adoptive parents and custodians of dependent children, specifying, for the first time, a procedure in which money appropriated annually for six human service programs — each of which addresses a different human service need — must be accounted for, aggregated and spent by counties; terminating further spending on cash general assistance; and imposing new work requirements and penalty provisions for recipients of medical assistance. As Appellants maintain, DPW's proposed unifying subject is broad enough that it could arguably encompass *all* of the human service programs in the Commonwealth administered by DPW and funded by the legislature. In accordance with our prior decisions relating to this subject, we deem such a capacious proposed unifying subject to be manifestly inadequate to meet the germaneness requirement. *See Leach v. Commonwealth*, 141 A.3d 426, 433-434 (Pa. 2016) (provisions criminalizing scrap metal theft and granting standing to individuals to challenge the constitutionality of municipalities' lost or stolen gun ordinances could not be unified under the general subjects of "regulation of firearms" or "the ability to own a firearm"); *Neiman* (holding that the proposed subjects of "refining civil remedies" or "judicial remedies" were too broad to be unifying subjects for multiple provisions of a bill pertaining to: deficiency judgment procedures, statutes of limitations for personal injury actions involving asbestos, delineating the jurisdiction of the county police, and setting sex offender registration requirements); *Pennsylvania State Association of Jury Commissioners*, 64 A.3d 611,619 (Pa. 2013) (provisions of statute allowing for sale of surplus farm (continued...)

Because the Senate's insertion of its own proposed legislation into the then wholly empty shell of H.B. 1261, P.N. 1385 transformed it into an entirely new bill consisting solely of those insertions, Article III, Section 4 of the Pennsylvania Constitution required this new bill to be considered by both Houses three times thereafter. As it is undisputed that the House considered the Senate's version of H.B. 1261 only once, however, Article III, Section 4 of the Pennsylvania Constitution was clearly, plainly and palpably violated.

Accordingly, the order of the Commonwealth Court is reversed, and the entirety of Act 80 is stricken as violative of Article III, Section 4 of our Constitution.

Jurisdiction relinquished.

Justices Donohue, Dougherty and Wecht join the opinion.

Justice Baer files a concurring opinion.

Justice Mundy files a concurring opinion.

Chief Justice Saylor concurs in the result.

---

(…continued)
equipment owned by counties, permitting the conduct of online auctions of personal property held by counties, and abolishing the office of jury commissioner could not be unified under the generic topic of "powers of county commissioners").