**[J-50-2022] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| JASMINE WEEKS, ARNELL HOWARD, PATRICIA SHALLICK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : : | No. 22 EAP 2021 Appeal from the order of the Commonwealth Court dated May 13, 2021 at No. 409 MD 2019. |
| Appellants | : : | ARGUED:  September 14, 2022 |
| v. | : : : : | |
| DEPARTMENT OF HUMAN SERVICES OF THE COMMONWEALTH OF PENNSYLVANIA, | : : : : : | |
| Appellee | : | |

**DISSENTING OPINION**

**JUSTICE WECHT**                    **DECIDED:  September 28, 2023**

The 1874 Constitution "was drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations and reflected a prevailing mood of reform."[1]  The political behavior engendering this distrust "took the form of special laws legislation, logrolling, and arbitrary favoritism" in service of private interests.[2]

---

[1]      *William Penn Sch. Dist. v. Pa. Dep't. of Educ.*, 170 A.3d 414, 423 n.13 (Pa. 2017) (internal quotation marks and related citations omitted); *see Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383, 394 (Pa. 2005) ("*PAGE*"); *see generally* Maj. Op. at 19-22.

[2]      *PAGE*, 877 A.2d at 394 (footnote omitted).  Logrolling "is the practice of 'embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the (continued…)

[The prevailing] lack of protection for the transparency of the legislative process enabled various legal provisions . . . to be surreptitiously inserted into a lengthy bill, often just before the final vote on it without all members of the General Assembly being aware of those provisions when voting on it. The General Assembly's failure to adhere to standards of regularity in the legislative process resulted in the degradation of the integrity of legislative enactments to such a degree that newspapers of the day observed that "it occasionally occurs that . . . proposed legislation is . . . wholly perverted from its true intention, and the perversion is not discovered until the bill has become a law by the signature of the Governor, hastily secured by some convenient friends."[3]

The post-bellum period was especially tumultuous in Pennsylvania, as the people experimented with how best to confer and restrain the power of the instruments of the Commonwealth's government, revisiting and substantially revising the Commonwealth's charter in 1863 and again in 1874. "[T]he public clamor to end" the underhanded legislative practices led Pennsylvanians to vote overwhelmingly to convene a constitutional convention in 1873, where they acted aggressively to curb legislative excess by imposing a suite of mandatory legislative procedures to ensure the orderly, transparent consideration and enactment of legislation, with the result embodied in the Pennsylvania Constitution of 1874.[4] Because this Court's case law continues to undermine that constitutional mandate, and because I would hold that Act 12 was enacted in violation of the Pennsylvania Constitution, I respectfully dissent.

---

individual matters to form a majority that would adopt them all.'" *Id*. at 394 n.7 (quoting Charles W. Rubendall II, *The Constitution and the Consolidated Statutes*, 80 DICK. L. REV. 118, 120 (1975)).

[3]     *Washington v. Dep't. of Pub. Welfare of the Commonwealth*, 188 A.3d 1135, 1145-46 (Pa. 2018) (citation omitted).

[4]     *Id*. at 1146.

Among the procedures and restrictions that our Pennsylvania forebears imposed are the constitutional provisions at issue in this case, which are materially unchanged from the form they took in 1874. Article III, Section 1, from which we derive the "original-purpose" requirement, provides that "[n]o law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either house, as to change its original purpose." In relevant part, Article III, Section 3, which furnishes the "single-subject" requirement, provides that "[n]o bill shall be passed containing more than one subject, which shall be clearly expressed in its title."

A lineage of case law spanning nearly 150 years since the people imposed these restrictions[5] reflects this Court's evolving effort to balance our competing concerns for the legislature's adherence to constitutional requirements with concerns that courts' overly-vigorous application of Article III's requirements will infringe prerogatives essential to the deal-making and compromise that attend the legislative process.[6] As the Majority and prior decisions acknowledge, our cases have struck that balance inconsistently.[7]

---

[5]    *See, e.g., Wheeler v. City of Phila.*, 77 Pa. 338 (1875) (regarding a bill approved on May 23, 1874, rejecting a single-subject challenge for want of sufficient pleading and rejecting a clear-title challenge summarily).

[6]    *See* Maj. Op. at 23-24 ("[D]ue to the nature of the legislative process, of which the offering of amendments by legislators or the insertion or deletion of various provisions is a wholly accepted part of the path through each house of the General Assembly, our Court has strived over the years to strike the appropriate balance between allegiance to the intent and purpose of Article III, Section 3, and, at the same time, to give a broad enough meaning to the provision to allow the legislative process to operate reasonably unimpeded.").

[7]    *See, e.g., id.* at 24 (Striking the appropriate balance "has proven to be complex and does not lend itself to bright-line rules. These characteristics of a single subject analysis, in turn, have resulted in a waxing and waning in how narrowly Section 3 has been construed."); *Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 64 A.3d 611, 616 (continued…)

Acknowledging that inconsistency has become a commonplace for this Court in recent decades, yet we have never explained or justified our ongoing struggle to apply clearly stated constitutional provisions with anything resembling doctrinal stability. So openly have our cases contradicted each other at times that language used pejoratively in one case has been cited as a legal truism in others. For example, in *City of Philadelphia*, while reviewing the history of single-subject decisions, this Court observed with some apprehension that, "[i]n more recent decisions . . . and despite the continued strong public policy underlying the single-subject requirement, some Pennsylvania Courts have become *extremely deferential* toward the General Assembly in Section [3] challenges."[8] This tendency, we added, "has resulted in a situation where germaneness[9] has, in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, over-arching topic to loosely relate the various subjects included in the statute under review."[10] But just three years later, considering another Article III challenge in *PAGE*, this Court uncritically cited with approval "the extremely deferential standard by which we view constitutional challenges"[11] in precisely the same context.

---

(Pa. 2013) ("[W]hat this Court has considered 'germane' and 'not germane' has fluctuated throughout the years.").

[8] *City of Phila. v. Commonwealth*, 838 A.2d 566, 587 (Pa. 2003) (emphasis added).

[9] As explained below, "germaneness" has over time become a catch-all test for compliance with both of the constitutional provisions at issue in this case as well as for Article III, Section 4, which requires that all laws be considered on three separate occasions in each house of the General Assembly. *See*, *e.g.*, *Washington*, 188 A.3d at 1151. It also has come in for its own criticism as being problematically malleable.

[10] *City of Phila.*, 838 A.2d at 587.

[11] 877 A.2d at 393.

The Majority observes that *PAGE* embodies this Court's "broadest interpretation of the single subject requirement."[12]  The Majority also observes that several post-*PAGE* cases have "reinvigorated a narrower understanding of the single subject requirement, rendering our decision in *PAGE* an outlier."[13]  In my view, these more recent cases charted a critical course correction, and they invite this Court to follow a more predictable approach to these challenges that vindicates the undisputed intentions of the ratifiers of the 1874 Constitution.  Alas, this is an invitation that we now have declined twice in this case.[14]

On balance, our cases have made a hash of Article III's requirements and subverted the ratifiers' animating intention.  One source of our difficulty seems to be our insistent superimposition of the uniformly described "germaneness" test upon constitutional provisions that utilize distinct words, implicitly calling for separate rubrics

---

[12]    Maj. Op. at 26.

[13]    *Id*. at 27.

[14]    Our first decision in this case—our most recent substantial comment on the original-purpose and single-subject requirements—reverted to an approach that is difficult to reconcile with our more recent cases.  And now, upon this case's return, the Majority regrettably amplifies this Court's suspect analysis in that decision.  *See Weeks v. Dep't. of Hum. Servs.*, 222 A.3d 722 (Pa. 2019) ("*Weeks I*").

Dissenting in *Weeks I*, focusing upon my concern that the Majority had exceeded the narrow inquiry we undertake in reviewing an order granting or denying a preliminary injunction in ongoing litigation, I observed that "the Majority not only [found] no *substantial question* with regard to the single-subject challenge, the only question we are called upon to consider, but it effectively *decide*[d] that question on the merits in favor of DHS, the consummation of its decision a mere formality on remand."  *Id*. at 742 (Wecht, J., dissenting) (emphasis in original).  Unsurprisingly, the Commonwealth Court later agreed. *Weeks v. Dept. of Human Servs.*, 255 A.3d 660, 666 (Pa. 2021) ("The Supreme Court's decision in [*Weeks I*] . . . was not a decision on the merits of [Weeks'] request for a permanent injunction.  Nevertheless, the Supreme Court's analysis is compelling and must be considered in reviewing [DHS's] demurrer.").

rooted in the plain text and without the baggage of the vague standards we have tied to the all-purpose "germaneness" test. Applying the Constitution's text according to its terms, Act 12 clearly was enacted in violation of the original-purpose and single-subject rules—for distinct reasons rooted in their differently worded mandates.

The following discussion begins, as it must, with the constitutional text. Then, I review in some detail our legacy of case law interpreting the original-purpose and single-subject rules. From there, I discuss what I believe to be the source of the confusion that plagues our case law in this area. Finally, I explain why my interpretation of what Section 1 and Section 3 require compels me to disagree with the Majority's approval of Act 12 in this case.

### *The Constitutional Text*

I begin with the text of Article III, Sections 1 and 3:

#### § 1. Passage of laws

No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

#### § 3. Form of bills

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

"When interpreting constitutional language, we are mindful that the language of the Constitution controls and that it must be interpreted in its popular sense, as understood by the people when they voted on its adoption."[15] "[I]f the constitutional language is clear

---

[15] *McLinko v. Dep't. of State*, 279 A.3d 539, 577 (Pa. 2022); *see In re Bruno*, 101 A.3d 635, 659 (Pa. 2014) ("[T]he polestar of constitutional analysis undertaken by the Court must be the plain language of the constitutional provisions at issue.").

and explicit, we will not delimit the meaning of the words used by reference to a supposed intent."[16] And "we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers and which reflects the views of the ratifying voter."[17]

"[T]here is a strong presumption in the law that legislative enactments do not violate our Constitution," which applies to enactment procedure, and "a statute will not be declared unconstitutional unless it clearly, palpably, and plainly violates the Constitution."[18] But "constitutional promises must be kept," and "the separation of powers in our tripartite system of government typically depends on judicial review to check acts or omissions by the other branches in derogation of constitutional requirements."[19] Ultimately, "the judicial branch cannot ignore a clear violation because of a false sense of deference to the prerogatives of a sister branch of government."[20] And the Constitutional text "must not be weakened by nice refinements or distinctions, or wrested from their plain and natural import."[21]

---

[16] *Robinson Twp. v. Washington Cnty. v. Commonwealth*, 83 A.3d 901, 945 (Pa. 2013) (plurality) (internal quotation marks omitted); *see Stilp v. Commonwealth*, 905 A.2d 918, 939 (Pa. 2006) ("Our . . . touchstone is the actual language of the Constitution . . . .").

[17] *Robinson Twp.*, 83 A.3d at 945 (internal quotation marks omitted).

[18] *PAGE*, 877 A.2d at 393 (emphasis omitted).

[19] *Wm. Penn Sch. Dist.*, 170 A.3d at 418.

[20] *Consumer Party of Pa. v. Commonwealth*, 507 A.2d 323, 334 (Pa. 1986), abrogated in part by *PAGE*.

[21] *Commonwealth v. Stofchek*, 185 A. 840, 843 n.2 (Pa. 1936).

***The Original-Purpose Problem***

Interpreting Article III, Section 1's original-purpose requirement, then, requires consideration of what the ratifiers would have understood the "original purpose" of a bill to be. The definition of purpose has been stable over many centuries.[22] In its "simple sense," the Oxford English Dictionary explains, the word means "[t]hat which one sets before oneself as a thing to be done or attained, the object which one has in view."[23]

Our case law has never openly questioned that the *original* purpose of a bill is the purpose an ordinary reader would glean from the bill in its originally-presented form.[24] In that regard, we long have recognized as a critical goal of Article III's requirements the assurance that the citizenry is informed as to the goings-on in the General Assembly, a

---

[22] We may seek guidance regarding a word's "common and approved usage" at the relevant time in dictionaries. *McLinko*, 279 A.3d at 577.

[23] *Purpose*, THE COMPLETE OXFORD ENGLISH DICTIONARY (2d Ed. 1991) (hereinafter "OED").

[24] *See Washington*, 188 A.3d at 1146 (noting that the original-purpose requirement bars "the addition of proposed legislation on a subject matter unrelated to that of the bill *as originally introduced*" (emphasis added)); *cf. Weeks I*, 222 A.3d at 743 (Wecht, J., dissenting) ("The least we can ask is that any reasonably broad subject we superimpose upon a bill for purposes of original purpose analysis should be one that a reasonable reader might glean from the original text without the benefit of hindsight informed by later amendments."). In *PAGE*, we underscored the importance of this approach to original-purpose analysis, criticizing and abrogating this Court's decision in *Consumer Party*, which erroneously conflated the original-purpose and single-subject inquiries by analyzing the original-purpose challenge by reference to "the title of the legislation and its content in final form." *PAGE*, 877 A.2d at 408; *see Marcavage v. Rendell*, 936 A.2d 188, 193 (Pa. Cmwlth. 2007) (referring to the original purpose of the bill challenged, "viewed in reasonably broad terms" according to its original form, as one criminalizing crop destruction, and comparing it to the final version, which "regulate[d] vastly different activities," adding provisions expanding the class of persons protected by the offense of ethnic intimidation). *Marcavage* is a Commonwealth Court decision, but we adopted that court's opinion as our own. *See Marcavage v. Rendell*, 951 A.2d 345 (Pa. 2008)(*per curiam*).

necessary factor in ensuring political accountability and in providing Commonwealth citizens with "a vital assurance . . . that they will be able to make their views and wishes regarding a particular piece of legislation known to their duly elected representatives **before** its final passage."[25]

The plain terms of Section 1 viewed in tandem with *Neiman* and cases cited therein make clear that the ratifiers' intention can be vindicated only if the bill enacted is consistent with what the citizenry might reasonably have anticipated at the time of the bill's introduction. The question the constitutional text plainly asks is whether every provision of the bill in its final form can be understood as advancing the original purpose a citizen might reasonably have discerned on the face of the bill as introduced.

But our case law has relegated this animating intent to the shadows. This Court's opinion in *PAGE*—which upheld what became the Gaming Act against various Article 3 challenges to the process by which it was proposed, amended, and enacted—exemplifies the problems prevalent in our original-purpose and single-subject case law. But one cannot review its discussion without first reviewing this Court's single-subject decision in *City of Philadelphia*, upon which *PAGE* primarily relied.

---

[25] *Commonwealth v. Neiman*, 84 A.3d 603, 612 (Pa. 2013) (emphasis in original); *see id.* (quoting *PAGE*, 877 A.2d at 395) ("[T]he single subject requirement proscribes the inclusion of provisions into legislation without allowing for fair notice to the public and to legislators of the existence of the same."); *Washington*, 188 A.3d at 1146 (noting that the single-subject requirement "safeguards the ability of all residents of the Commonwealth who will be impacted by a bill to have the opportunity to make their views on its provisions known to their elected representatives *prior to their final vote on the measure*"). We noted the importance of public notice in connection with Section 3's clear-title requirement a mere decade after the ratification of the 1874 Constitution. *See Fredericks v. Pa. Canal Co.*, 2 A. 48, 49 (Pa. 1885) (rejecting a Section 3 challenge because, "as [the title] gives such notice of the subject of the bill as reasonably to lead to an inquiry into the body thereof, that is all that is required").

In *City of Philadelphia*, the challenged law began as a five-page bill that the title described as "Amending Title 53 (Municipalities Generally) of the Pennsylvania Consolidated Statutes, further providing for governing body of municipal authorities."[26] Its only substantive provision "was the inclusion of a citizenship requirement for the board members of business improvement district authorities pursuant to the Municipal Authorities Act."[27] In the months after its introduction, with only minor changes along the way, the bill was read in each house of the General Assembly on three occasions as prescribed by Article III, Section 4.[28] Only after those readings did a Senate committee introduce the amendments that created the single-subject problem, and the bill thus amended was resubmitted to the Senate for a final vote just two days before the end of the legislative session. These eleventh-hour, post-third reading changes radically expanded the bill, which had grown to 127 pages with an astonishing multiplicity of new provisions that (among other things) altered the Pennsylvania Convention Center Authority's board and governance, transferred authority over taxis and limousines in Philadelphia from the Public Utility Commission to the Philadelphia Parking Authority, expanded bonding requirements for developers, and prohibited police officers from participating in political campaigns.

Although *City of Philadelphia* did not involve an original-purpose challenge under Section 1, it did express concern with—and push back against—what the Court then

---

[26]     838 A.2d at 571.

[27]     *Id.*

[28]     PA. CONST. art. III, § 4 ("Consideration of bills"), provides in relevant part: "Every bill shall be considered on three different days in each House. . . ."

viewed as the increasing latitude Pennsylvania courts had been granting the General Assembly in the course of applying the single-subject test. In particular, the Court expressed concern that courts were applying the "germaneness" test that Pennsylvania courts long have applied,[29] sometimes confusingly, to all of the requirements set forth in Article III, Sections 1, 3, and 4 of our Constitution.

In *PAGE*, what became the Gaming Act originated in the House of Representatives on February 3, 2004, as a one-page bill entitled "An Act Providing for the Duties of the Pennsylvania State Police Regarding Criminal History Background Reports for Persons Participating in Horse Racing," and it "dealt exclusively with the Pennsylvania State Police providing support to the State Harness and Horse Racing Commissions by performing criminal history checks and the verification of fingerprints of applicants for licensure under the Race Horse Industry Reform Act of 1981."[30] The bill was considered in this limited form three times by the House and twice by the Senate. But in the third and final Senate consideration on July 1, 2004, the bill's title was changed to include what the *PAGE* Court described as "multiple" and "extensive" amendments—an almost euphemistic description, because the one-page bill had ballooned to 146 pages. As amended, the bill created an entirely new slots gaming industry and detailed an elaborate system of

---

[29] "Germaneness" as a general concept appears in connection with Article III requirements as early as 1878 and has remained ever since, over time becoming the prevailing standard. *See, e.g., Craig v. First Presbyterian Church of Pittsburgh*, 88 Pa. 42, 46 (Pa. 1878) (rejecting the argument that the subject of a supplemental bill was not clearly expressed in the bill, and holding that the supplement was "germane to the subject of the original bill" because "[t]hey all relate to cemeteries and the dead therefrom"); *In re Reber*, 84 A. 587, 589 (Pa. 1912) (observing that "[p]rovisions for attaining various objects which relate to the general subject of the bill" "are all germane to the main purpose of the act").

[30] *PAGE*, 877 A.2d at 391.

revenue generation and disbursement, administration, and oversight. A mere two days after this "amended" bill first appeared in that form, it was submitted and voted upon by the House on Saturday July 3 and passed by the Senate on Sunday (which also was Independence Day). In two business days and a holiday weekend, a bill that had provided narrowly for regulatory matters pertaining to the comparatively niche industry of horse-racing, and as such of interest to only a handful of people, had been transformed abruptly into one of the largest, most complex, economically consequential bills in the history of the Commonwealth, one that broadly affected millions of Pennsylvanians and thousands of Pennsylvania businesses in innumerable ways—all in blink-and-you-might-miss-it fashion.

Unsurprisingly, the Gaming Act was challenged vigorously, including for alleged original-purpose and single-subject violations. The argument in support of an original-purpose violation was compelling for obvious reasons. And it was betrayed no more effectively than by the Commonwealth, itself, which posited the "regulation of gaming" as the original purpose of a one-page bill laser-focused on specified police enforcement functions associated with horse-racing.

Reaffirming that the original-purpose test is inherently comparative, the Court observed that Section 1 reflects a constitutional requirement in the bill introduction and amendment process of "some degree of continuity in object or intention."[31] But in an

---

[31]    *Id*. at 408. This purported paraphrase arguably diminishes the explicit, textual requirement of a bill's unity of *purpose* at inception and the contributory role of all provisions found in the final bill at enactment. Similarly, the Court's qualified indication that Section 1's "verbiage certainly suggests a comparative analysis" is too ginger by half. Hedged paraphrases like these bedevil our Article III case law in derogation of clear constitutional commands.

unexplained leap from this simple description, the Court prescribed a two-part test; the first component of the test was the textually rooted comparative analysis, but the second concerned whether the bill, in its final form, is deceptive in its title or contents.[32]

Turning to the first test, so described, the *PAGE* Court invoked the *City of Philadelphia* Court's observation, albeit in relation to a single-*subject* challenge, that a reasonably broad assessment of the original *purpose* is necessary to ensure that the legislature has space to make the sort of amendments that are a necessary aspect of a process rooted in negotiation and compromise among legislators with diverse interests.[33] With little fanfare, the *PAGE* Court begged its own rejection of the original-purpose challenge by accepting summarily the Commonwealth's claim that the "primary objective of the [original bill] was to regulate gaming."[34]  This was an improbably broad account of a narrow original bill pertaining on its face to horse-racing regulation.  Especially in light of its equally narrow original title, no reasonable reader would naturally characterize the bill's original purpose to encompass all gaming, especially gaming in a form that didn't legally exist in Pennsylvania when the bill was introduced.  As well, it was a dubiously modest characterization of the *final* bill, which may have regulated gaming in a sense, but primarily did so relative to an entire industry that the bill, itself, created.

---

[32]     Justice Mundy correctly notes that this aspect of the *PAGE* test lacks constitutional provenance.  *See* Conc. Op. at 1-2 (Mundy, J.).

[33]     As I explain below, how a bill traveled to its enacted form is irrelevant to the single-subject inquiry, which specifies only a necessary condition for a bill in its enacted form. That condition is not informed by the various iterations of the bill during its journey.

[34]     *PAGE*, 877 A.2d at 409.

*PAGE* showed no consideration for the notice to that the public the original-purpose requirement is designed to ensure, nor did it indicate how the citizenry might have learned that a statute creating a multi-billion-dollar state-wide industry promising sweeping effects for every community in the Commonwealth would pass the legislature within two days of its introduction in that form, let alone how citizens might have organized against the bill's passage in that time frame, and amidst Independence Day festivities to boot. Importantly, the Court in no way engaged the constitutionally prescribed question: whether all of the provisions of the final bill were encompassed by a reasonably inferred original purpose as determined solely by reference to the bill as introduced.[35]

Then came *Stilp v. Commonwealth*,[36] in which a one-page bill became a politically and legally fraught behemoth very late in the legislative process. This Court nonetheless rejected an original-purpose challenge. Entitled "An Act relating to compensation for executive branch officials," and providing as a short title the "Executive Branch Official Compensation Act,"[37] the original bill was introduced in the House on May 3, 2005, and provided only that no executive official's compensation could exceed the Governor's. The bill with only minor amendments was reviewed three times and received final passage in

---

[35]     The distinction between inferring an original purpose, inferring a final purpose, and comparing them, versus inferring a reasonably broad original purpose and then reviewing the final bill's provisions for conformity with that purpose may be subtle, but it is consequential. The test primarily appears in the former guise in our case law, including in the Majority opinion in this case. *See* Maj. Op. at 36. But that formulation interposes an additional layer of inference and extrapolation—*i.e.*, inferring an overarching purpose from the final bill as well as the original—which increases the risk of uncertainty twofold. The Constitution does not ask whether the final *purpose* of the bill is consistent with the original purpose. It asks whether the final bill's provisions serve the bill's original purpose.

[36]     905 A.2d 918 (Pa. 2006).

[37]     *Id*. at 953 (cleaned up).

the House of Representatives on June 8, 2006. The Senate, too, reviewed the bill twice, then made a minor amendment and passed it following a third reading, returning it to the House on July 6, 2006. But the House rejected the amendment, the Senate non-concurred, and a conference committee was convened. The conference committee's amended bill appeared just one day later, on July 7. The amended bill comprised twenty-two pages and proposed federally linked, formulaic salary increase structures to all manner of officials in all three branches of government.[38] By the end of that same day, it had been passed by both houses of the legislature *and* signed into law by the Governor. In fewer than forty-eight hours, and with only one nominal review of the bill in its final form before passage by each house, a bill that originally limited the compensation of certain executive branch officials had become a law that overhauled the compensation scheme throughout Pennsylvania government.

The challengers argued that the original bill's lone purpose was to ensure that the Governor was the highest-paid executive official. The respondents argued that the original purpose viewed generally was "to provide compensation for government officials."[39] With little elaboration, the Court adopted the respondents' account of the original and final purpose and concluded that, in its final form, the bill related to this purpose. Again, no regard was expressed for the limited period within which the people might have learned that, far from enshrining the relatively uncontroversial proposition that no executive official should be paid more than the Governor, the bill now increased the compensation for a raft of public officials and tied future increases formulaically to federal

---

[38]     *Id*. at 954.

[39]     *Id*. at 957.

employee compensation schedules, which some Pennsylvanians might have opposed for any number of reasons. Once again, it would be farcical to suggest that time to express opposition was afforded. By the time the average Pennsylvanian learned of the scope of the bill submitted for final passage, it was already law.

After *PAGE*'s and *Stilp*'s summary rejections of compelling original-purpose and single-subject challenges, the tide turned to some degree.[40] But it did so in cases focused upon the single-subject requirement, which is the topic of the next section of my discussion. Relative to the original-purpose requirement, our next robust consideration did not occur until the instant litigation came before us the first time, when we were called upon to consider Weeks' effort to secure a preliminary injunction staying Act 12's application until the Article III challenges were decided on the merits.

In that decision, the Majority paid lip service to the proposition that it is not the role of a court reviewing the grant or denial of a preliminary injunction to finally decide the merits. But in the end the Majority did nothing less, unequivocally rejecting the Section 1 and Section 3 challenges.[41] "The original subject of the bill," the Court explained, "was limited to the Cash Assistance provision."[42]

---

[40] *See* Maj. Op. at 27.

[41] *See Weeks I*, 222 A.3d at 730 ("[W]e find that the Commonwealth Court correctly concluded that no [original-purpose] violation had occurred.").

[42] *Id*. More specifically, the bill in its original form proposed to eliminate Cash Assistance, a program, providing a modest monthly stipend to (as of 2019) at least 12,000 qualified Pennsylvanians who were unable to work and had no other source of income. As well, Pennsylvania has a Medical Assistance program that provides state-funded health insurance to certain individuals—and at the time of Act 12's passage under certain circumstances one's Cash Assistance status could affect Medical Assistance eligibility. *See generally* Maj. Op. at 4-5; Diss. Op. at 3 (Donohue, J.).

The Court cautioned that, in reviewing an original-purpose challenge, "every effort is made to uphold the law by hypothesizing a reasonably broad topic even for the original version of the bill, while not crediting a topic so broad as to drain the germaneness test of meaning."[43] The Court observed that amendments to bills are par for the legislative course and that the germaneness test "affords due regard for the necessity of preserving flexibility in the legislative crafting process, while maintaining the strength of the safeguards for the regularity and transparency of the process afforded by" Section 4.[44] The Court explained that "the same germaneness test as expressed in [*Washington* in addressing a Section 4, three-reading challenge] is used in considering whether a change of purpose under Section 1 occurred during the legislative process."[45]

The *Weeks I* Majority cited *Stilp*'s flawed prescription that a court reviewing an original purpose challenge first must compare the original purpose of the bill, construed in reasonably broad terms, to its final purpose to determine whether there has been an alteration in that purpose. But then the Court further obfuscated the direct comparison of the original purpose of the bill to the provisions of the bill it became by indicating "that a potential unifying purpose *is not judged solely according to the provision with which the bill started*, but by reference to a sufficiently broad . . . purpose within which all the

---

[43]     *Weeks*, 222 A.3d at 730. The Court's formulation clearly ran afoul of my earlier observation regarding the distinction between teasing out *one* original purpose and measuring the final bill provision by provision for its role (or lack of a role) in advancing that purpose versus surmising as a well a broad final purpose and using that as the basis for comparison. It also reflected our persistent confusion regarding the distinct definitions of "subject" and "purpose."

[44]     *Id*. at 731 (quoting *Washington*, 188 A.3d at 1151).

[45]     *Id*.

amendments in the final bill may also fit."[46]  In effect, the Majority indicated that a reviewing court would not merely posture itself as a hypothetical citizen determining a reasonably broad purpose from the original bill viewed in isolation but instead would rig the inquiry by reverse engineering conformity of purpose in light of the amendments that followed.  The Court then found (accurately) that the provisions of Act 12 in its original form all related "in some way to Cash Assistance," and (inaccurately) that those provisions were later merely "supplemented by other sections falling within the rubric of a single unifying topic."[47]

The conflation here is plain: the original-purpose requirement doesn't ask whether there is some "single unifying topic" at the last—that's the business of the single-subject requirement.  The original-purpose test is comparative: assess an original purpose for a bill based solely upon its text, then measure the final enacted law to determine whether its provisions all relate to and advance that original purpose.  Still, even this conflation did not adequately support the Majority's analysis.  The Majority itself characterized the original bill as relating "in some way to Cash Assistance."  This clearly could not capture all of the provisions that ended up in Act 12, which came primarily to address medical service and funding-related matters that had no bearing whatsoever on Cash Assistance, let alone its termination.

### The Single-Subject Problem

The single-subject requirement is equally clear in its meaning, even if it can be challenging to apply.  First, we should acknowledge that a bill's "purpose," the concern of

---

[46]     *Id*. (emphasis added).

[47]     *Id*.

Section 1, should not be understood to be synonymous with "subject," which is Section 3's focus. As Justice Mundy observes, "[a] bill's purpose is its intention or objective, *i.e.*, the 'end in view,' . . . whereas the subject of a bill is the topic it deals with."[48] Second, the assumption that the words carry distinct meanings arises from our obligation to give discrete effect to all constitutional provisions rather than adopting an interpretation that renders terms redundant.[49] An authoritative definition of "subject" is every bit as familiar as that of the word "purpose." In the first relevant definition of the word, we find that the same dictionary cited above describes a subject as "[t]he substance of which a thing consists or from which it is made."[50] This meaning has been stable for centuries, leaving little room to quibble over how the ratifiers understood it.[51]

The ill that the single-subject requirement was designed to cure, and the means by which it was designed to do so, have never been described more aptly than in *Payne v. School District of Borough of Coudersport*.[52] There, this Court drew upon the New Jersey Constitution's parallel provision, which by its terms aimed "to avoid improper

---

[48] *See* Conc. Op. at 3 (Mundy, J.) (quoting *Purpose*, WEBSTER'S NEW WORLD COLLEGIATE DICTIONARY (4th ed. 1999)).

[49] *See Robinson Twp.*, 83 A.3d at 946. This is yet another reason to question the wisdom of using "germaneness" in analyzing the four distinct constitutional inquiries that appear in Sections 1, 3, and 4, given the risk, long since realized, that four distinct constitutional requirements will be hopelessly admixed when tested by one overriding rubric.

[50] *Subject*, OED.

[51] To illustrate what I take to be the distinction, the *subject* of Act 12 as introduced was Cash Assistance. Its *purpose*, though, was the *elimination* of Cash Assistance. Thus, if a bill began as one that proposed to end Cash Assistance but it later was amended to preserve and extend Cash Assistance, one might credibly argue that the final bill violated the original-purpose requirement but satisfied the single-subject rule.

[52] 31 A. 1072 (Pa. 1895).

influences, which may result from intermixing in one and the same act, such things as have no proper relation."[53]  Elaborating in an oft-quoted passage, the *Payne* Court observed:

> Few bills are so elementary in character that they may not be subdivided under several heads; and no two subjects are so wide apart that they may not be brought into common focus, if the point of view be carried back far enough.  The quotation from the constitution of New Jersey furnishes the proper light in which to define the word 'subject.'  Those things which have a 'proper relation to each other,' which fairly constitute parts of a scheme to accomplish a single general purpose, 'relate to the same subject' or 'object.'  And provisions which have no proper legislative relation to each other, and are not part of the same legislative scheme, may not be joined in the same act.[54]

We could have stopped there with "proper relation" and "a scheme to accomplish a single general purpose."  This would have left us better off than we are with the more nebulous germaneness test.

The principal concern was the aforementioned practice of logrolling, by which legislators extract from each other or from the Governor support[55] for measures they might otherwise oppose by lashing disfavored measures to those of greater popular appeal or greater political consequence.  We long-ago quoted a participant in the

---

[53]     *Id*. at 1074.

[54]     *Id*.

[55]     The Majority aptly notes that logrolling may just as perniciously be used to force a Governor to sign (or at least not veto) a bill as it may be used to cobble together a bare majority for a suite of legislative provisions that would not command a majority individually.  Maj. Op. at 21 (The single subject limitation "guarantee[s] the same freedom from 'logrolling' during executive review of legislative enactments." (quoting ROBERT F. WILLIAMS, THE LAW OF AMERICAN STATE CONSTITUTIONS, 261-62 (2009); citing in accord *Attorney Gen. v. Barnett*, 48 A. 976 (Pa. 1901))).

constitutional convention, who aptly explained why the single-subject rule was important

to those who ratified it:

> The objects had in view in the adoption of [the single-subject requirement] were to prevent 'log-rolling' and fraud, trickery, or surprise in legislation. Every measure is to stand upon its own merits without borrowing strength from another, and the members of each House, and still more the public, are to have notice by its very title of the contents or nature of a bill.[56]

More recently, echoing *Payne*, this Court described the single-subject imperative as

follows: "our task is to ascertain whether the various components of the enactment are

part of 'a unifying scheme to accomplish a single purpose.'"[57]

But then we unnecessarily blurred this standard with germaneness:

> [O]ur Court has interpreted Article III, Section 3 as mandating that . . . ["]the differing topics within the bill must be 'germane' to each other." *Jury Comm'rs*, 64 A.3d at 616.
>
> * * * *
>
> In determining "germaneness," our Court has acknowledged that some degree of deference to the General Assembly's prerogative to amend legislation is required, due to the normal fluidity inherent in the legislative process, and, thus, we have deemed it is appropriate for a reviewing court to hypothesize a "reasonably broad topic" which would unify the various provisions of a final bill as enacted. *City of Philadelphia*, 838 A.2d at 588. However, our Court has also stressed the reasonable aspect of any proposed hypothetical unifying topic, in recognition of the fact that Article III, Section 3 would be rendered nugatory if such hypothetical topics were too expansive.[58]

As described above, in *City of Philadelphia*, the challenged bill began with a lone

substantive provision that required citizenship of board members of business

---

[56]     *Stofchek*, 185 A. at 843 n.2 (quoting the writings of Charles R. Buckalew, who was an active participant in the 1873 constitutional convention).

[57]     *Neiman*, 84 A.3d at 612 (Pa. 2013) (quoting *City of Phila.*, 838 A.2d at 589).

[58]     *Id*.

improvement district authorities under the Municipal Authorities Act.[59] Only *after* each house of the legislature completed its three prescribed readings did a Senate committee introduce the amendments that were challenged as violative of Section 3. The bill thus amended was resubmitted to the Senate for a final vote just two days before the end of the legislative session. The now-127-page bill included the broad array of new provisions detailed earlier.

The Court acknowledged that "bills frequently are amended as they pass through the Legislature . . . . [Section 3 is] often satisfied where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title."[60] The Court then noted that in earlier years, the Court "applied the 'germaneness' test in a fairly strict manner."[61] For example, the Court found that the regulation of land surveyors and professional engineers encompassed two subjects because the two professions were not the same.[62] The Court rejected another bill that contained three provisions pertaining to water canals, governing

---

[59] *Id.*

[60] *Id.* at 586-87. Even allowing that *City of Philadelphia* is the recent case that seems most faithful to the Constitution's proper function, the Court is not immune to creating problems with its poorly chosen language. In this one short passage, with its use of the word "otherwise," the Court suggests that "germaneness" is an *alternative* to assisting in carrying out a bill's main objective, such that a bill can weather a single-subject challenge for no better reason than that a given late encrustation on the bill "is germane to the bill's subject as reflected in its title." I'm not entirely sure what this means, but I know that recent legislative practice is not so much to describe a purpose in a bill's title as it is to index at length, but in vague, often neutral terms, the contents of the bill. The simple truth is there can be no alternative to testing whether any given provision advances a proposed unifying topic that is not overbroad.

[61] *Id.* at 587.

[62] *See Woodruff v. Humphrey*, 136 A. 213 (Pa. 1927).

respectively maintenance, the sale of canal water, and the Commonwealth's acquisition and sale of portions of canals.[63]

But a countervailing trend had emerged more recently:

[D]espite the continued strong public policy underlying the single-subject requirement, some Pennsylvania Courts have become extremely deferential toward the General Assembly in Section [3] challenges. . . . [T]hey have tended to apply the single subject standard to validate legislation containing many different topics so long as those topics can reasonably be viewed as falling under one broad subject. . . . [I]t has resulted in a situation where germaneness has, in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, over-arching topic to loosely relate the various subjects included in the statute under review.[64]

The Court cited numerous Commonwealth Court cases that exemplified the mischief anticipated in *Payne*'s cautionary observation that "no two subjects are so wide apart that they may not be brought into common focus, if the point of view be carried back far enough."[65]  "[Ex]ercising deference by hypothesizing reasonably broad topics . . . is appropriate to some degree,"[66] the *City of Philadelphia* Court observed, lest a reviewing court "exercise a pedantic tyranny over the legislative process."[67]  But the *City of Philadelphia* Court stressed that "[t]here must be limits . . . as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject

---

[63]    *See Yardley Mills Co. v. Bogardus*, 185 A. 218 (Pa. 1936).

[64]    *City of Phila.*, 838 A.2d at 587.  As noted earlier, this last characterization, presented here as a cautionary note, is remarkably similar to our uncritical description in later cases of the *applicable* standard.  As I read this latter passage, "loose" apparently is fine, provided the "loosely" defined subject also is not overbroad.  The persistence of porous terms like these is as maddening as their inevitably inconsistent application.

[65]    31 A. at 1074; *see City of Phila.*, 838 A.2d at 587-588.

[66]    *City of Phila.*, 838 A.2d at 588.

[67]    *Id*. (quoting *In re PennDOT*, 515 A.2d 899, 902 (Pa. 1986)).

requirement."[68]  In that event, Section 3 "would be rendered impotent to guard against the evils that it was designed to curtail."[69]  The Court then reviewed the disparate subjects touched upon by the voluminous legislation there at issue and, rejecting the almost comically expansive proposed unifying topic of "municipalities" as too broad in its scope, invalidated the act as "an omnibus bill, whether or not it is called that in name."[70]

PAGE, however, retreated from City of Philadelphia's single-subject rigor, in deed if not in word:

> In contrast to City of Philadelphia, in the matter sub judice, there is a single unifying subject—the regulation of gaming.  The single topic of gaming does not encompass the limitless number of subjects which could be encompassed under the heading of "municipalities."  Specifically, [the Gaming Act] sets forth the legislative intent of regulating gaming, creates the Gaming Control Board, establishes policies and procedures for gaming licenses for the installation and operation of slot machines, enacts provisions to assist Pennsylvania's horse racing industry through other gaming, and provides for administration and enforcement of the gaming law, including measures to insure the integrity of the operation of slot machines.[71]

In Spahn v. Zoning Board of Adjustment,[72] too, this Court took an extremely deferential approach, rejecting a persuasive single-subject challenge.  In that 2009 case, a bill that originally increased penalties and forfeitures for violation of the Philadelphia Code was amended at the last minute, among other things to limit the circumstances in which Philadelphia citizens would have standing to challenge municipal actions.  The

---

[68]     Id.

[69]     Id.

[70]     Id. at 589.

[71]     PAGE, 877 A.2d at 396.

[72]     977 A.2d 1132 (Pa. 2009).

challengers argued that the late-night addition of the standing provision to a bill that had not previously touched upon that topic violated the public transparency and political accountability that the single-subject rule was intended to safeguard. The *Spahn* Court acknowledged that "reasonable notice is the keystone" of Section 3,[73] but still found no violation. Without commenting on the importance for citizens of learning the parameters of their ability to hold their local government accountable through litigation, the Court opined that the original bill and the amendments "involved changes directly related to the grants of powers and limitations on Philadelphia Home Rule," and that "the *legislators* had reasonable notice that the amendments were germane to the grants of powers and limitations on Philadelphia government."[74]

But it hasn't always been this way. In *Jury Commissioners*, for example, this Court found a single-subject violation. The Court explained that the single-subject requirement "serves the dual purposes of preventing the enactment of laws that otherwise would not be passed [*i.e.*, logrolling], and promoting the enhanced scrutiny of single topic bills."[75] The Court then invoked the "germaneness" test, although the Court acknowledged that "what this Court has considered 'germane' and 'not germane' has fluctuated throughout the years."[76] Applying these principles, the Court found that the law in *Jury Commissioners* violated the single-subject requirement. The challenged law implicated the authority of county commissioners in two ways: first, it addressed commissioners'

---

[73]     *Id*. at 1148 (quoting *PAGE*, 877 A.2d at 395).

[74]     *Id*. at 1148 (Pa. 2009) (emphasis added).

[75]     64 A.2d at 616.

[76]     *Id*.

authority to auction private property and surplus farm equipment online, which the Court observed to be an executive function; second, it allowed commissioners to eliminate the elected office of jury commissioner, thus affording the former a fundamentally legislative power that was entirely distinct from the auction function except by relating both (as proponents of the law's validity argued) to the yawning subject of "the powers of county commissioners." The Court found this to be more like the rejected unifying subject of "municipalities" in *City of Philadelphia* than it was like the supposedly narrower unifying subjects we conjured in *PAGE* and *Spahn*.

To similar effect were our decisions in *Neiman* and *Leach v. Commonwealth*.[77] The statute subject to challenge in *Neiman* in its final form amended the sex offender registration law, deficiency judgment procedures, county park police jurisdiction, and the statute of limitations for asbestos claims. This Court was unconvinced by both the Commonwealth's proposed unifying subject of "civil remedies" and the legislature's proposed subject of "judicial remedies and sanctions." Finding no other "unifying scheme to accomplish a single purpose,"[78] the Court determined that the law violated the single-subject rule.

In *Leach*, the challenged law, *inter alia*, added a new criminal offense for theft of secondary metals; amended an existing trespass provision of the Crimes Code; and provided standing for individuals and organizations to challenge local gun regulations. This Court rejected the proposed unifying subject of "amending the Crimes Code" as overbroad and the subject "regulation of firearms or the ability to own a firearm" as failing

---

[77] 141 A.3d 426 (Pa. 2016).

[78] *Neiman*, 84 A.3d at 612 (quoting *City of Phila.*, 838 A.2d at 589).

to define a nexus or common purpose between civil remedies for local gun regulation and the criminalization of theft of secondary metals.[79]

But then came *Weeks I*, and with it the return of extreme deference. There, the Majority somewhat inverted the single-subject inquiry into an "*un*-relatedness" test:

> The gist of [*City of Philadelphia*, *Jury Commissioners*, *Neiman*, *Leach*, *Spahn*, and *PAGE*] is that a bill will be held to violate the single-subject rule only if it includes topics with "unrelated subject matter," where "unrelated" connotes that any attempt to tie the provisions together within a single, unifying subject necessarily involves an overly-broad topic—such as the business of the courts, municipalities, or the economic wellbeing of the Commonwealth—which would empty the germaneness test of all meaning.[80]

In the *Weeks I* Majority's view, "[Act 12] as a whole relates to the provision of benefits pertaining to the basic necessities of life to certain low-income individuals."[81] The Majority elaborated that some such benefits "may be in the form of cash assistance for such items as basic utility services, food, clothing, and personal hygiene products, while others may be supplied through medical or nursing-home care, the delivery of which is incentivized by payments to providers."[82] Notably, the Majority did not speak to the numerous provisions that fell outside even these descriptions. These included provisions adjusting the Medicaid designation of hospitals; changing hospital assessments in service of ensuring a continuing flow of Federal Medicaid funds; and those authorizing distribution of revenues collected under the Philadelphia Hospital Assessment. Importantly, Act 12 also provided that Hospital Assessment revenues could be used for a broad array of

---

[79] *Leach*, 141 A.3d at 434.

[80] *Weeks I*, 222 A.3d at 729.

[81] *Id*.

[82] *Id*.

public health programs that serve the general population, not just the economically disadvantaged, including programs and initiatives with no direct connection to "the basic necessities of life" for low-income people as a class. Nor did the Majority consider that low-income Pennsylvanians number in the millions while Cash Assistance recipients number in the low five figures. Nonetheless, the Court found this proposed subject "both unifying and sufficiently narrow to fit within the single-subject rubric as that concept has been spelled out in the reported decisions of Pennsylvania appellate courts."[83]

### Toward a Solution

There are several clear problems with which this Court must reckon if it is to restore a cogent account of each requirement that honors the ratifiers' intent in adopting Sections 1, 3, and 4 of Article III. In *PAGE* and *Weeks I*, and now in this case, the Court has applied an original-purpose test that introduces elements of legislative deception into the Section 1 inquiry.[84] And we have cited in that connection a subsidiary question regarding the deceptiveness of the title as such, even though Section 1 does not mention the title and Section 3 *does*, suggesting that the ratifiers had considered the relevance of a statute's title to Article III's several requirements and did not deem that concern relevant to the original-purpose analysis.[85] The *first* component of the *PAGE* test, and that factor alone, adheres roughly to the plain language of Section 1, prescribing a simple

---

[83] *Id*. at 730.

[84] *See* Maj. Op. at 36 (quoting *PAGE*, 877 A.2d at 409).

[85] I think the framers would agree that a statute's title may fairly provide insight into an enactment's original purpose. But that is distinct from requiring an assessment of a title's deceptiveness about the contents of a bill in connection with the original-purpose requirement.

comparative analysis of the provisions of the final bill in order to determine whether they advance a reasonably broad account of the purpose of the bill as originally introduced, viewed through the eyes of a citizen with nothing but that original bill in hand. We should stop there.

Relatedly, the Court has not infrequently blessed consideration of a bill's evolution through amendment to inform its original purpose analysis *and* in connection with the single-subject inquiry.[86] But a bill's progress toward enactment has no bearing on what notice the bill in its original form provided to citizens or legislators of what the legislature was considering enacting, the sole concerns of Section 1. Furthermore, it says nothing about the unity of subject of a bill at the time of its enactment or the descriptive sufficiency of its title at that time, the concerns of Section 3. In short, both Section 1 and Section 3 call for the utilization of a snapshot of the bill to measure against the applicable standard. For Section 1, the snapshot occurs at the time of the bill's introduction. The provisions of the *final* bill—another snapshot—are measured for their function, if any, in advancing the bill's original purpose. For Section 3, the snapshot occurs at enactment, and it is the *only* consideration that matters, since one can only then assess the degree to which the provisions of a bill have a nexus to a single subject that is not overly broad at that time.

I also am concerned about the Court's tendency to imply that the legislature's collective state of mind informs the constitutional permissibility of its gambol at the edge of constitutional limitations. It is true that the Article III requirements in some sense sprung from the ratifiers' concern for intentional legislative deception, both among

---

[86] *See* Maj. Op. at 28 ("[W]hen engaging in a germaneness analysis [under the single-subject test], a court may hypothesize a reasonably broad purpose for a bill that encompasses the original text and amendments thereto . . . .").

legislators and with respect to the public. But the requirement was not drafted so as to *inquire* as to the legislature's intent to deceive in a given case. Rather, it is a *per se* rule predicated on the *assumption* that the absence of such a requirement inexorably will lead to deception.

Similarly, we have long agreed that Section 3's single-subject requirement reflected and effectuated a categorical rejection of omnibus bills and a strong desire to end logrolling as a legislative tactic to force the passage of disfavored, unpopular, or simply unanticipated laws. But here as well, Section 3 is a *per se* rule to prevent such tactics regardless of how or why they are employed.[87]

The damage that our unpredictable approach to these issues incurs is not hypothetical. We have ample evidence that the legislature now routinely subverts the ratifiers' intentions in obvious ways. In various cases, including this one and some described above, the legislature makes radical additions to bills after the second or third reading of a much simpler bill that in no way anticipated the dramatic additions to come. Such changes happen at the tail end of legislative sessions, on holiday weekends, or scant days before some important program is about to expire, one that only the rushed bill can preserve. Often the populace has virtually no opportunity to rally and express opposition to the final bill.

These occurrences frustrate the ratifiers' intent, and our reticence to interfere has only encouraged the General Assembly to utilize these tactics by giving legislators good

---

[87] With respect to Section 4's reading requirement, the ratifiers' intent comprised concern for probity and deliberation, as well as for slowing down the process in furtherance of civic awareness and engagement. Here, too, the textual requirement is unequivocal and therefore does not invite consideration of the legislators' intent in bypassing or manipulating the three-reading requirement.

reason to think their handiwork will pass judicial scrutiny. To correct this pattern, we should stop compromising these important checks on legislative gamesmanship by "nice refinements or distinctions wrested from [Article III's] plain and natural import."[88] Most importantly, we can and should measure our fidelity to those who ratified the 1874 Constitution by how frequently the General Assembly engages in precisely the conduct that we have often acknowledged the ratifiers intended to prevent. Unless we are satisfied that prevailing legislative practices are in keeping with what we have recognized as the ratifiers' intent, we must concede that we are coming up short in our efforts to ensure adherence to the Constitution's requirements. And I find it difficult to imagine how anyone might reconcile the persistent legislative pattern of transformative, eleventh-hour amendments introducing unforeseeable stand-alone legislative schemes with the transparent, orderly, and methodical legislative practice that the ratifiers envisioned. Whatever rubric we cite, we bless legislation passed this way frequently enough that the General Assembly has taken it as license to persist in the same practices.

This case provides a perfect example of precisely the abuses detailed above, and Act 12's general incompatibility with Sections 1 and 3 makes that painfully clear. There seems to be no dispute that eliminating Cash Assistance in a clean bill was a non-starter. Governor Wolf had made clear his opposition to eliminating Cash Assistance.[89] So the General Assembly waited until a critical and unrelated set of programs and drawdowns were set to expire, inserted them into Act 12, and finally approved the bill less than three business days before the relevant deadline to preserve hundreds of millions of dollars of

---

[88] *Stofchek*, 185 A. at 843 n.2 (Pa. 1936).

[89] *See* Diss. Op. at 12 (Donohue, J.).

federal funds would expire.  With so much on the line for so many Pennsylvania citizens and institutions, the Governor, calling the dilemma that the legislature had foisted on him a Hobson's Choice, signed Act 12 into law two days later.

The Majority sees it differently.  The Majority explains:

Viewed in reasonably broad terms, the original purpose of Act 12 was to eliminate Cash Assistance while favoring health-specific benefits for low-income individuals, as evidenced by the Human Services Code's provisions which eliminated the Cash Assistance program and reaffirmed the continuance of the Medical Assistance program for low-income individuals. . . .  While the amendments made to the original bill were extensive, . . . the central objective of the legislation remained to "eliminate Cash Assistance while favoring health-specific benefits for low-income individuals."  The purpose of both the original bill and the final bill is the same.[90]

I certainly agree with the Majority to the extent that it identifies the original purpose of Act 12 as the elimination of the Cash Assistance program.  But I disagree that the technical changes made to insulate the medical assistance program from becoming damage collateral to the elimination of Cash Assistance would have been perceived by a reasonable reader of the original bill as what the Majority calls the reaffirmation of "the continuance of the Medical Assistance program."[91]  The amendments associated with medical assistance eligibility merely were necessary to insulate the medical assistance program's status quo from eliminating Cash Assistance for anyone whose eligibility for medical assistance was made contingent on the receipt of cash assistance.[92]  As best I can tell, no one was added to or removed from the medical assistance program by

---

[90]     Maj. Op. at 37.

[91]     *Id*.

[92]     *See* Diss. Op. at 3 & n. 5 (Donohue, J.).

operation of Act 12, and ensuring continued eligibility was the only reason the bill contained any reference to medical assistance at all. These modest revisions to medical assistance eligibility provisions only *underscore* for any reasonable reader that the lone *purpose* of Act 12 as originally submitted was to eliminate Cash Assistance and nothing more. In short, no reasonable reader would have looked at the original bill and believed that the *purpose* of the bill, as revealed by the revisions it proposed to existing law, was designed to accomplish anything more than eliminating Cash Assistance.

Even though this observation alone is sufficient to establish an original-purpose violation, the Majority's analysis suggests the misapprehension regarding the governing standard that I addressed earlier in this opinion. Having identified an original purpose that is broad, but perhaps not reasonable in the shoes of a hypothetical lay observer, the Majority then identifies a final purpose for the Act that unsurprisingly matches the original. But that move subtly shifts the analysis away from the proper inquiry. The issue isn't one of purpose-matching, as it were. Rather, we must identify a reasonably broad purpose in the original bill without reference to what it later became, then skip directly to the law as enacted and ask whether every substantive provision of that law serves the original purpose we have gleaned. The Majority's approach necessarily invites reverse engineering in service of finding a unifying theme, however broad. But that is precisely what we must *not* do, because it is entirely too easy, viewing both bills side by side, to find some unifying purpose if we try hard enough—precisely the concern described in *Payne*. Here, with a proper understanding of the original modifications to medical assistance as mere byproducts of the obvious purpose to end Cash Assistance, it is clear none of the provisions added thereafter advanced that purpose in any material way. As

such, the final bill simply went places in service of various ends that a citizen could not have anticipated based upon a review of the first bill, denying the citizen notice of what actions the legislature proposed to take.

Act 12 also fails the single-subject test. The Majority proposes as a unifying subject that Act 12's "provisions all relate to benefits pertaining to the basic necessities of life to low-income individuals."[93] And it concludes summarily that even those Act 12 provisions that provided numerous ancillary benefits to the public at large nominally tied to public health "still fall within [that] unifying single subject."[94] Moreover, the Majority assures us that, because of the unifying effect of this subject, Act 12 can't be "unconstitutional logrolling"[95]—this despite its acknowledgment that Governors can be logrolled and that Governor Wolf in this case effectively said that his signature was forced. In any event, the fact of logrolling, like the fact of deceptive or wrongful intent, is immaterial to a constitutional test that cites neither of those considerations. The only question concerns legislative compliance with the prohibition upon bills that by any reasonable assessment legislate as to more than one subject.

Even if I agreed that, if you squint just right, you can view every item in Act 12 as somehow involving "benefits pertaining to the basic necessities of life to low-income individuals," the question the Majority doesn't ask is what *else* might pertain to the basic necessities of life to low-income individuals? For that matter, what are necessities? The Majority's proposed unifying subject is no less broad than, say, the powers of county

---

[93]    Maj. Op. at 29.

[94]    *Id*. at 30.

[95]    *Id*.

commissioners at issue in *Jury Commissioners*.  Yes, county commissioners have broad bailiwicks and manifold powers.  But so, too, do low-income individuals have diverse and numerous necessities of life, and on the Majority's account just about anything that confers a benefit on the public at large falls within that rubric by extension.[96]  Act 12's breadth *exceeds* constitutional boundaries by analogy to *City of Philadelphia*, *Jury Commissioners*, *Neiman*, and *Leach*.  Second, for reasons detailed by Justice Donohue in dissent, even that problematic subject fails to capture everything in Act 12.[97]  And we have made clear in cases like *City of Philadelphia* that Section 3 will not tolerate statutes ostensibly linked by a single, broad hypothetical subject when that subject fails to describe a nexus that encompasses *every* provision of the bill.

This case presents an excellent opportunity to re-center the constitutional text in Article III analysis, to reduce the fundamental inconsistency revealed by the sum of our prior Article III decisions, and to substantially restore the deteriorated guardrails that the ratifiers of the 1874 Constitution installed specifically to prevent legislative methods that persist 150 years after the people sought to end them.  Regrettably, the Majority opts to let that opportunity pass.

No doubt, such a course correction would complicate the legislative process, narrowing the parameters within which the people's representatives may negotiate and compromise to make sound laws that are responsive to and in the interests of their

---

[96]  *See* Diss. Op. at 8 (Donohue, J.) ("Based on [the Majority's] reasoning, virtually any legislative act focused on benefitting the general public could fit into the subject of 'the provision of benefits pertaining to the basic necessities of life for low-income individuals' so long as low-income individuals are involved in some capacity.").

[97]  *Id.*

constituents. But if those difficulties are unfamiliar, it is only because for too long we have granted the General Assembly greater latitude than the 1874 Constitution envisaged. The Constitution must prevail over inconvenience. And the General Assembly well knows and regularly demonstrates that the process for proposing amendments to the Pennsylvania Constitution for the voters' consideration is not terribly burdensome.[98] If our legislature wants to enjoy the United States Congress' ability to rely heavily on omnibus bills full of dexterous logrolling, cajoling earmarks, and special laws to pass what won't draw a majority standing alone, all that it must do is fashion an amendment and persuade voters that Article III has outlived its usefulness or doesn't mean what it presently says. In the meantime, this Court should continue to insist on faithful adherence to the Constitution's own teachings.

---

[98] Among proposed constitutional amendments the General Assembly has put on the ballot in recent years are amendments: imposing mandatory retirement on judges (approved); abolishing Philadelphia Traffic Court (approved); authorizing local taxing authorities to exempt the full value of homesteads from property taxes (approved); constitutionalizing "Marsy's Law," which *inter alia* would have enshrined certain rights for victims of crime (deemed unconstitutionally proposed for violating the law requiring a separate vote on discrete constitutional amendments); expanding the existing state loan program for volunteer fire departments to municipal fire departments and non-profit EMS providers (approved); precluding race and ethnicity discrimination (approved); and two amendments that collectively modified the Governor's and General Assembly's respective roles regarding the termination and extension of emergency declarations (approved).