**[J-50-2022] [MO: Todd, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| JASMINE WEEKS, ARNELL HOWARD, PATRICIA SHALLICK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : : : : : | No. 22 EAP 2021 Appeal from the order of the Commonwealth Court dated May 13, 2021 at No. 409 MD 2019 |
| Appellants | : : | ARGUED: September 14, 2022 |
| v. | : : : | |
| DEPARTMENT OF HUMAN SERVICES OF THE COMMONWEALTH OF PENNSYLVANIA, | : : : : : | |
| Appellee | : | |

**DISSENTING OPINION**

**JUSTICE DONOHUE**                         **DECIDED: September 28, 2023**

Because I would find that Act 12 violates both the "original purpose" rule and the "single subject" rule, I respectfully dissent from the Majority's holding to the contrary.

Appellants have a difficult burden to overcome, as "acts passed by the General Assembly are strongly presumed to be constitutional, including the manner in which they were passed." *Commonwealth v. Neiman*, 84 A.3d 603, 612 (Pa. 2013). While the burden is certainly high, it can be overcome, as evidenced by our prior case law.[1] In my

---

[1] *See, e.g.*, *City of Phila v. Commonwealth*, 838 A.2d 566 (Pa. 2003) (rejecting the proposed subject of "municipalities" as overly broad in violation of Article III, Section 3); *Neiman*, 84 A.3d 603 (Pa. 2013) (rejecting the overly broad proposed subjects of "refining civil remedies or relief" or "judicial remedies and sanctions"); *Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 64 A.3d 611 (Pa. 2013) (rejecting the proposed subjects "amendments to the county code" or "powers of county commissioners" as (continued…)

view, the Majority's proposed subject[2] and purpose[3] connecting the patently disparate provisions of Act 12 are unreasonably broad, and thus undermine the purpose of Article III, Sections 1 and 3. *See Washington v. Dep't of Pub. Welfare*, 188 A.3d 1135, 1152 (Pa. 2018) ("[A] hypothetical subject cannot be unduly expansive, lest the purpose of the constitutional provision be defeated."). However, even if I accepted the Majority's proposed topics, not all of Act 12's provisions could readily be considered germane under them. Regardless of whether the topics are unduly expansive or cannot satisfy the germaneness inquiry, I find that the Majority's holding condones the logrolling[4] which Article III, Sections 1 and 3 were intended to prevent.

To mirror the Majority's discussion, I begin with the single subject rule. Article III, Section 3, otherwise known as "the single subject rule," provides: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." PA. CONST. art. III, § 3. To test compliance with this standard, we engage in a "germaneness" inquiry, pertinent to both Section 1 and Section 3 analyses. *Washington*, 188 A.3d at 1151 n.33. In conducting this inquiry, a court determines whether the subjects of a legislative enactment are germane, i.e., whether they "have a nexus to a common

---

unconstitutional under Article III, Section 3); *Leach v. Commonwealth*, 141 A.3d 426, 433 (Pa. 2016) (rejecting the proposed subject of "regulations of firearms" or "ability to own a firearm" as unconstitutional).

[2] The Majority concludes that the provisions of Act 12 all "fall within the unifying single subject of 'the provisions of benefits pertaining to the basic necessities of life for low-income individuals.'" Majority Op. at 30.

[3] According to the Majority, the original bill's purpose was to "eliminate Cash Assistance while favoring health-specific benefits for low-income individuals." Majority Op. at 37.

[4] "Logrolling is the practice of embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all." *Pennsylvanians Against Gambling Expansion, Inc. v. Commonwealth*, 877 A.2d 383, 394 n.7 (Pa. 2005) ("*PAGE*") (internal quotation marks omitted).

purpose." *Neiman*, 84 A.3d at 612. In other words, it must be determined whether the "various components of the enactment are part of a unifying scheme to accomplish a single purpose." *Id.* (internal quotations and citation omitted). In acknowledging the realities of the legislative process, "a reviewing court may hypothesize a 'reasonably broad' unifying subject; however, such a hypothetical subject cannot be unduly expansive, lest the purpose of the constitutional provision be defeated." *Washington*, 188 A.3d at 1152.

Act 12 contains provisions that achieved the following: eliminated the General Assistance Cash Assistance program ("Cash Assistance"); maintained the status quo for the Medical Assistance program ("Medical Assistance");[5] reauthorized Nursing Facility Incentive Payments;[6] reauthorized and increased revenue-raising tax for hospitals in Philadelphia ("Philadelphia Hospital Assessment"), which further allowed municipalities to use their portion of revenues generated by that assessment on "public health programs;" and revised the Statewide Quality Care Assessment.

States and the federal government jointly finance Medicaid. GOV'T ACCOUNTABILITY OFF., *Report: CMS Needs More Information of States' Financing and Payment Arrangements to Improve Oversight*, at 1 (2020). States, including Pennsylvania, finance their share from general funds and other sources, including taxes on healthcare providers and funds from local governments. *Id*. By relying on healthcare provider taxes and local government funds, the Commonwealth is able to draw down substantial sums in federal matching funds. *Id.* at 1-2. Thus, the share of the Medicaid payments for the

---

[5] Act 12 achieved this by removing any reference to Cash Assistance under Medical Assistance's eligibility requirements and from the definition of "General Assistance."

[6] These annual incentive payments are paid to nursing facilities that have a certain percentage of patients on Medical Assistance. DHS, *Disproportionate Share Incentive Payments*, https://www.dhs.pa.gov/providers/Providers/Pages/Disproportionate-Share-Incentive-Payments.aspx (last visited June 30, 2023).

Commonwealth decreases, thereby theoretically increasing the payments made by the federal government.[7]

The Statewide Quality Care Assessment is one type of tax referenced above that goes towards financing the Commonwealth's obligations under the jointly-funded Medicaid program. 62 P.S. § 803-G(a) ("The assessment authorized under this article … may be collected only to the extent and for the periods that the secretary determines that revenues generated by the assessment will qualify as the State share of the program expenditures eligible for Federal financial participation."). The Statewide Quality Care Assessment taxes the net inpatient revenue of "[a]ll inpatient acute general and freestanding rehabilitation hospitals located within the Commonwealth[.]" DHS, *Statewide Hospital Quality Care Assessment Frequently Asked Questions*, at 1 (2016).

The Philadelphia Hospital Assessment permits Philadelphia to levy taxes on "General Acute Care Hospital[s]" and "High Volume Medicaid Hospital[s]." Act of June 28, 2019, P.L. 43, No. 12, § 6. The city then collects the funds generated by the assessment and remits a portion of the funds to the Commonwealth for the purpose of "assuring that medical assistance recipients have access to hospital and healthcare services," 62 P.S. § 802-E(a). The city is then authorized to retain funds to recoup the cost of administration of the assessment and the costs of operating public health clinics and public health programs.[8]

---

[7] Interestingly, the United States Government Accountability Office posits that this type of arrangement results in some providers receiving a smaller net Medicaid payment overall once the provider taxes they contributed are taken into account. GOV'T ACCOUNTABILITY OFF., *Report: CMS Needs More Information of States' Financing and Payment Arrangements to Improve Oversight*, at 25-26 (2020).

[8] Specifically, Act 12 provides:

> Upon collection of the funds generated by the assessment authorized under this article, the municipality shall remit a portion of the funds to the Commonwealth for the purposes

(continued…)

The provisions discussed above involve revenue generation and spending, not limited to Medicaid recipients, and they comprise the bulk of Act 12's content. The Majority considers the common purpose to be that all of Act 12's provisions "relate to benefits pertaining to the basic necessities of life to low-income individuals." Majority Op. at 29 (citing *Weeks v. Dep't of Hum. Servs.*, 222 A.3d 722, 730 (Pa. 2019) ("*Weeks II*")). As previously noted,[9] this Court has found similarly expansive proposed single-subjects overly broad under Article III, Section 3. For instance, in *City of Philadelphia*, the challenged legislation brought about several changes to local governance and related administrative matters and altered certain aspects of the administration of the Pennsylvania Convention Center. *City of Philadelphia*, 838 A.2d at 571. The Commonwealth proposed that the single subject uniting all of the provisions to be "municipalities." *Id.* at 589. We found such a proposed subject overbroad, noting, inter alia, that "municipalities" was the subject of an entire Title of the Pennsylvania Consolidated Statutes. *Id.* However, this Court also reasoned that even if we had accepted the broad overarching topic to be "municipalities," we still could not find that all of the provisions were germane to that topic; particularly, the provisions that impacted the Convention Center. *Id.* at 589-90. Similarly here, the proposed single subject (i.e., "the provisions of benefits pertaining to the basic necessities of life for low-income individuals") is essentially the subject of an entire Title of the Pennsylvania Consolidated Statute, Title

---

set forth under section 802-E, except that the municipality may retain funds in an amount necessary to reimburse it for its reasonable costs in the administration and collection of the assessment and to fund a portion of its costs of operating public health clinics and public health programs as set forth in an agreement to be entered into between the municipality and the Commonwealth acting through the secretary.

Act of June 28, 2019, P.L. 43, No. 12, § 7.

[9] *See* supra note 1.

67 – Public Welfare. As in *City of Philadelphia*, even if the proposed overreaching topic was not overbroad, not all of Act 12's provisions are germane to that topic, particularly the revenue generating assessments that are used broadly for public health programs.

In *Neiman*, we found a bill that amended sex offender registration provisions, deficiency judgment procedures, county park police jurisdiction, and the statute of limitations for asbestos claims violated Section 3's single subject rule. *Neiman*, 84 A.3d at 610. The Commonwealth proposed the single subject to be "refining civil remedies," while the General Assembly argued that all provisions related to the "single subject of judicial remedies and sanctions." *Id.* The *Neiman* Court found both proposals to be "far too expansive[,]" as such subjects could be virtually boundless as they could encompass "**any** civil court proceeding" and "**any** power of the judiciary" to order payment in any civil matter. *Id.* at 613 (emphasis in original). Even in considering the facially disparate provisions at issue in *Neiman*, we could find no reasonable focus to connect them. *Id.* Here, the Majority's proposed unifying subject is also virtually boundless since any enactment by the Legislature benefits the public which necessarily includes low-income individuals.

In *Leach* we found that a bill that eliminated municipalities' right to regulate firearms and amended certain crimes totally unrelated to firearms was in violation of Section 3. In that case, the legislators contended that all provisions fit under the topic of "revising the Crimes Code." We determined that this proposed subject was too broad as it could capture anything in the Crimes Code including, inter alia, crimes, defenses, penalties, victims' rights, and civil penalties. *Leach*, 141 A.3d at 434. Moreover, we found that the legislators' alternative theory—"Crimes Code amendments involving the regulation of firearms or the ability to own a firearm"—was similarly in violation of Section 3, as there was no way to relate regulation of firearms with the other crimes amended by the bill. *Id.*

The provisions of Act 12 and the proposed unifying subject suffer from the same defect because it can capture virtually any topic related to low-income individuals; but even despite this breadth, the topics are not all germane to the proposed subject.

In an attempt to reconcile its holdings, the Majority asserts that its proposed single subject—"benefits pertaining to the basic necessities of life to low-income individuals"—is "far narrower" than those proposed in *City of Philadelphia* and *Neiman*. Majority Op. at 30-31. Respectfully, our case law demonstrates otherwise. The Majority suggests that the challenged legislation in those previous cases all violated Section 3 solely on the basis that they contained such disparate provisions that they could not possibly be unified under a single subject. *Id.* at 31. However, in most of these cases, we reasoned that the proposed topics themselves **could** cover all the provisions contained therein by virtue of an unreasonably broad topic, but we found them defective anyway.[10]

Based on the Majority's rationale, its proposed single subject creates such a boundless category that it defeats the purpose of Section 3. Take, for instance, the provision of Act 12 that explicitly permits municipalities to retain taxes to sponsor public health programs.[11] Neither the parties nor the Majority discount that this portion of the Act benefits the public-at-large. However, the Majority, with no explanation, credits DHS's assertion that these are "ancillary benefits to the populous at large" that "still fall within

---

[10]  *See, e.g.*, *City of Philadelphia*, 838 A.2d at 589 ("[A]s virtually all of local government is a 'municipality,' we find that proposed subject too broad to qualify for single-subject status[.]"); *Neiman*, 84 A.3d at 613 (finding the proposed subjects "far too expansive … as such subjects are virtually boundless").

[11]  As the Majority recognizes, these public health programs could include "educational programs to reduce tobacco use and obesity; air pollution monitoring; enforcement of lead-free rental requirements; programs to promote immunization; water quality programs; childhood literacy programs; and the provision of care services in neighborhood health centers[.]" Majority Op. at 30. Such programs, according to Appellants, could also include "restaurant and retail food inspection, air and water quality, animal control, [and] inspection of barber and beauty establishments[.]" Appellants' Brief at 35.

the unifying single subject of 'the provision of benefits pertaining to the basic necessities of life for low-income individuals.'"[12]  Majority Op. at 30; *see also* DHS's Brief at 36 ("[T]he ancillary benefits to the public-at-large do not render Act 12 unconstitutional.").  Based on this reasoning, virtually any legislative act focused on benefitting the general public could fit into the subject of "the provision of benefits pertaining to the basic necessities of life for low-income individuals" so long as low-income individuals are involved in some capacity. This is no different from *City of Philadelphia*'s boundless topic of "municipalities" or *Neiman*'s subjects of "refining civil remedies" or "judicial remedies and sanctions."  These subjects, including the Majority's proposal, all capture far more than is reasonable for one piece of legislation.  As relevant here, the Majority's subject could capture any public program whatsoever since by definition, low-income individuals would be involved.[13] *Neiman*, 84 A.3d at 613.  To condone such a subject undermines the purpose Section 3.

_____

[12]  Although Justice Dougherty's Concurring Opinion offers an explanation as to how the statute could be construed narrowly so that the "public health programs" funded by the Philadelphia Hospital Assessment are solely directed to benefitting low-income individuals, *see* Concurring Op. at 2-3, I do not believe the statutory language supports the conclusion.  It is true that Section 802-E provides that the assessment generates the funding "for the purpose of assuring that medical assistance recipients have access to hospital and other health care services." 61 P.S. 802-E(a).  However, Section 804-E states that the funds generated by the Philadelphia Hospital Assessment are remitted to the Commonwealth for "the purpose set forth under [S]ection 802-E, **except**" the municipality may retain those funds to reimburse themselves for costs related to administering and collecting the assessment and a portion of those funds may be used for the operation of "public health clinics and public health programs as set forth in an agreement to be entered into between the municipality and the Commonwealth[.]"  *Id.* § 804-E(a).  Accordingly, while I agree that some of the funds generated for the hospital assessment are statutorily prescribed for the purpose of benefiting medical assistance recipients by funding certain healthcare providers, based on the text of Section 804-E, the funding of "public health programs" is likewise authorized and there is no requirement that they exclusively benefit low-income individuals.  Indeed, DHS agrees that the benefits will inure to the pubic-at-large.

[13]  Under the Majority's tenuous rationale, public school funding would likewise fit within its unduly expansive subject because there are children from low-income families that attend public schools.  Likewise, low-income families use highways and benefit from (continued…)

Despite the breadth of the Majority's proposed subject, not all of Act 12's provisions could be deemed germane to the subject of "the provisions of benefits pertaining to the basic necessities of life for low-income individuals."  Even if the Statewide Quality Care Assessment could be squeezed into the Majority's proposed definition,[14] the Philadelphia Hospital Assessment specifically authorizes funding the cost of public health programs and therefore, it cannot be germane to the Majority's proposed subject.  Even one outlier provision is sufficient to demonstrate a violation of the single subject rule.  *See, e.g.*, *City of Philadelphia*, 838 A.2d at 589-90 (reasoning that, in addition to the proposed subject being too broad, the bill violated Section 3 because its provision relating to the change in composition of the Pennsylvania Convention Center Authority's governing board was not germane to the proposed topic).  Again, neither the Majority nor DHS disagree that such a provision benefits the public-at-large.  Majority Op. at 30; DHS's Brief at 36.  If designating such consequence as "ancillary" circumvents the lack of germaneness to the Majority's proposed subject, then we no longer have a germaneness requirement.  No explanation is given as to how the provision of unspecified public health programs specifically benefits low-income individuals when it indisputably benefits the general public.  It is equally correct to say that low-income individuals are the recipients of ancillary benefits under this provision.  Accordingly, I see no way that Act 12 can survive under the Majority's proposed subject.

In a similar vein, the "original purpose" rule, as set forth in Article III, Section 1, provides: "No law shall be passed except by bill, and no bill shall be altered or amended, on its passage through either House, as to change its original purpose."  PA. CONST. art.

---

improvements to water and sewer facilities and air quality to name a few areas within the Legislature's purview that would fit within the Majority's proposed single subject.

[14]  The funds generated by the Statewide Quality Care Assessment apply to the state's share of Medicaid funding that would otherwise be contributed from the general fund, thereby allowing funding in other areas not uniquely benefitting low-income individuals.

III, § 1. The constitutionality of a legislative act challenged under Section 1 is evaluated under a two-prong test:

> First, the court will consider the original purpose of the legislation and compare it to the final purpose and determine whether there has been an alteration or amendment so as to change the original purpose. Second, a court will consider, whether in its final form, the title and contents of the bill are deceptive.

*PAGE*, 877 A.2d at 408-09. In making this determination, courts engage in the same "germaneness" inquiry as conducted under the single subject rule analysis. Courts then determine whether "the amendments to the bill added during the legislative process are germane to and do not change the general subject of the bill." *Washington*, 188 A.3d at 1151 (citing *Stilp*, 905 A.2d at 959). "Amendments are germane to the original general subject matter of a bill if both the subject of the amendments and the subject of the original contents of the bill 'have a nexus to a common purpose.'" *Id.* (citing *Neiman*, 84 A.3d at 612). In other words, we must engage in a comparison of the original bill and the final bill to determine whether there has been an "unconstitutional alteration … so as to change the original purpose of the bill." *PAGE*, 877 A.2d at 408. Again, in acknowledging the realities of the legislative process, this Court views the "original purpose" in "reasonably broad terms." *Id.* at 409.

Here, it is clear from the text of the original three-page bill that its purpose was to eliminate Cash Assistance. *Weeks II*, 222 A.3d at 730-31 ("The original subject of the bill was limited to the cash assistance provision … H.B. 33 originally had only three provisions, all relating in some way to Cash Assistance."); *see also* H.B. 33, Printer's No. 0047 (2019). The amendments that led to the fifteen-page bill were completely separate and distinct from the "original purpose," i.e., to eliminate Cash Assistance. Thus, these amendments fundamentally transformed the legislation. As detailed above, the amendments included provisions related to revenue generation, funding for hospitals and

healthcare providers, and also included the promotion of spending for public health programs.

The Majority identifies the "original purpose" of Act 12 to be "to eliminate Cash Assistance while favoring health-specific benefits for low-income individuals[.]" Majority Op. at 37. It then suggests that in comparing the final bill and its numerous unrelated amendments to the original bill, that Act 12 satisfies the "original purpose" rule. I cannot agree. For one, this Court previously identified the "original purpose" of the bill to be "limited to" Cash Assistance, i.e., its elimination. *Weeks II*, 222 A.3d at 730. I find it telling that the Majority found it necessary to broaden the original purpose of the bill for purposes of merits review in order to uphold the expanded Act 12's conformance with the Article III, Section 1.[15] Although we employed the "highly deferential" standard to review the preliminary injunction in *Weeks II*, the original purpose of the Act is not a moving target. It originally said the same thing as it says now on merits review. Then and now, the purpose was to eliminate Cash Assistance. In my view, to conclude that these revenue and spending provisions, which comprise the majority of the final bill, serve the original purpose of eliminating Cash Assistance ignores what actually happened to this bill.

We previously found the original bill's purpose to be clear: the bill eliminated Cash Assistance. However, the Majority has departed from our previous finding as to Act 12's original purpose, and instead substituted it for one that still cannot survive our review. I see no reasonable way to read the original bill and determine that it was intended to eliminate Cash Assistance in favor of anything else, let alone health-specific benefits for low-income individuals. In the initial bill, the amendments to the Human Services Code were limited to eliminating any reference to Cash Assistance from the eligibility requirements or definitional sections, including those that also referenced Medical

---

[15] I note that the Majority adopted our previous articulation of the proposed "single-subject" from *Weeks II*, *see* Majority Op. at 29 & n.24.

Assistance. H.B. 33, Printer's No. 0047 (2019). Simply because both Cash Assistance and Medical Assistance fell under the category of "General Assistance" in the Human Services Code does not mean that the elimination of Cash Assistance suggests a preference for Medical Assistance. It means that the General Assembly's plan was to eliminate Cash Assistance, and it had to delete any reference to it in order to accomplish that goal. Accordingly, I cannot agree with the Majority's proposed original purpose, as it unreasonably suggests the initial bill did more than it actually did.

Moreover, and critically, accepting the Majority's proposed subject and hypothetical purpose condones the type of logrolling which both Sections 1 and 3 of Article III intended to prevent. It is undisputed that former-Governor Wolf supported the revenue measures, but he did not support the elimination of Cash Assistance. However, because of what he considered to be a "Hobson's Choice," Governor Wolf signed the bill into law to ensure that the hospitals would receive necessary funding. Ed Mahon, PA. POST, "*Cash for the poor? Yes. Arming teachers? No. And 4 other highlights from #AskGovWolf*" June 20, 2019, https://www.witf.org/2019/06/20/cash-for-the-poor-yes-arming-teachers-no-and-4-other-highlights-from-askgovwolf/ (last visited Aug. 29, 2023). This circumvention of the executive's veto power is part of what the single subject rule was intended to eliminate. *See Commonwealth ex rel. Att'y Gen. to Use of Sch. Dist. of Patton v. Barnett*, 48 A. 976, 977 (Pa. 1901) (acknowledging the relationship between the single-subject rule and veto power). "[B]y joining a number of different subjects in one bill the governor was put under compulsion to accept some enactments that he could not approve, or to defeat the whole, including others that he thought desirable or even necessary." *Id.* This is precisely what happened with Act 12.

This Court is duty bound to interpret the Constitution as it is written.[16] Article III, Sections 1 and 3 were written with the intent of curtailing the very legislative abuses that have taken place here. To presume the constitutionality of the Legislature's actions is one thing, but to condone such overly expansive concepts, as the Majority does today, gives the Legislature free rein to combine disjointed provisions into a single act.

For the above reasons, I respectfully dissent.

---

[16] My learned colleague has suggested that this Court's application of the "original purpose" and "single subject" analyses in prior cases have gone too far afield of what is required by our constitutional language. *See* Dissenting Op. at 29 (Wecht, J., dissenting). While this observation may be apt, I note that no party has asked us to overrule any case that would allow us to depart from our current application of the "original purpose" and "single subject" rules. Accordingly, we must adhere to our precedent until a litigant raises an appropriate challenge.